# Sylvan Seal Milk, Inc., v. Pennsylvania Milk Control Commission

*Fox, Rothschild, O'Brien & Frankel,* for appellant.

*G. C. Fogwell, Jr.,* for Pennsylvania Milk Control Commission.

GORDON, JR., P. J., January 29, 1951.—This is an appeal by Sylvan Seal Milk, Inc., from a majority decision of the Pennsylvania Milk Control Commission (Commissioner Snyder dissenting) revoking the milk dealer's license held by appellant under the Milk Control Law of 1937.[1] Section 404(10) of the act authorizes the commission to revoke a dealer's license upon a determination that he has violated any of the provisions of the act or any of the rules, regulations or orders of the commission issued thereunder. The citation issued against Sylvan Seal charged it with violating section 807 of the act, and section 16 of General Order B-1, the latter being merely a repetition of the language of section 807, prohibiting the sale of milk at less than the minimum prices fixed by the commission. That section provides that no method or device shall be lawful whereby milk is sold at a price less

---

[1] Act of April 28, 1937, P. L. 417, as amended by the Act of July 24, 1941, P. L. 443, sec. 30, 31 PS §700(j)-807.

than the minimum price applicable to the particular transaction, whether by discount, premium, rebate, free service, trading stamps, advertising allowance, or extension of credit, or by a combined price for such milk together with another commodity. . . .[2]

In its efforts to increase the sale of its products, Sylvan Seal, appellant, which sells only to retail grocers, conceived the idea of installing in the stores of its customers a modern, attractively designed refrigerated display cabinet of the self-serving type, which is decorated with tasteful advertising material calculated to attract the attention of customers to the Sylvan Seal products. This cabinet was installed in the stores of a number of grocers under a written leasing contract, which provides that title to the cabinet shall remain in appellant with the right to repossess it on 48 hours' notice; that appellant services it at its own expense, the grocer being obligated only to provide the electric current to operate it, and that the grocer may use the cabinet "only in accordance with the instructions of Sylvan Seal". The principal instruction, not contained in the contract but observed by the grocers, is that the

---

[2] The relevant portion of the section reads as follows: .

"No method or device shall be lawful whereby milk is bought or received or handled on consignment or otherwise, or sold or handled or delivered or made available on consignment or otherwise, or offered to be bought or received or handled on consignment or otherwise, or sold or handled or delivered or made available on consignment or otherwise, at a price less than the minimum price applicable to the particular transaction, whether by any discount, premium, rebate, free service, trading stamps, advertising allowance, or extension of credit, or by a combined price for such milk, together with another commodity or a service which is less, or is represented to be less, than the aggregate of the price of the milk and the price or value of such commodity or service when bought or received or handled on consignment or otherwise, sold or delivered or made available on consignment or otherwise, or offered for sale, delivery, purchase, handling or receiving separately or otherwise."

cabinet be used solely for Sylvan Seal milk and dairy products. It is conceded that appellant billed and collected from the grocers the full price for its milk required by the commission's orders, but the commission held that, by furnishing such cabinets to the grocers at no cost to them under the terms of the contract as outlined above, appellant has employed a "method or device" substantially prohibited by the general order referred to, thereby enabling it to sell milk to them below the minimum price established by the commission. If this be so, the appeal should be dismissed; if not, it should be sustained and the decision of the commission reversed. The decision of the case turns, therefore, upon a determination of the true nature and practical effect of the leasing contract under which the cabinets are furnished to the grocers.

In addition to the contract itself, the evidence presented to the commission on this question establishes the following facts:

Sylvan Seal wholesales milk and other dairy products to grocers in the Philadelphia area, but, unlike its principal competitors, it does not sell milk directly to the consumer. Because of its exclusive reliance on store sales, the company felt that it was not adequately reaching its potential market and, therefore, cast about for some advertising method to effectively increase its sales. Accordingly, it conceived the idea of installing attractive, refrigerated display cabinets in stores handling its milk. Most grocers keep milk in general purpose, closed refrigerators located out of sight in the rear of their stores. The milk is thus hidden from the view of customers, with a resultant loss of sales through neglect of the valuable and well-recognized element of a visual stimulus in selling. In addition, since the grocer's profit margin on milk is relatively low, he has little incentive to promote its sale. Hence, appellant's cabinets were primarily designed as an

advertising medium, although the elements of convenient self-service and adequate preservation of their products also enters into their design. With these purposes in mind, appellant developed its cabinets as an integral part of its advertising campaign. Among professional marketing men, milk is regarded as a "convenience item", the purchase of which is normally so uniform and small that the ordinary customer feels little or no incentive to increase his purchases, or put himself to the inconvenience of "shopping" for a particular brand. The same considerations operate to slow up the sales of cheese and related dairy products, which are also "impulse" or "convenience" commodities, likely to be bought when the customer sees them, but easily overlooked when out of sight. Sylvan Seal pioneered in introducing paper containers in place of bottles for the sale of milk at retail, and is spending a "six-figure" sum on newspaper, radio and television advertising. Much of this selling effort is, in the opinion of the company, wasted if its products are not prominently displayed at the point of purchase. In this connection, Mr. Fuller, president of the company, who has an extensive advertising background, testified:

". . . Our delivery service, our packaging, our other point of sale material, and the display cases, are tied into one package, one dependent upon the other for increased success.

The evidence discloses that milk distributors supply grocers with various advertising devices and materials, such as blinking electric signs, window posters, calcomanias, and the furnishing of free samples, the value of which runs from a few dollars up to as much as $30 a year. It is significant that the commission has never objected to such practices, but, on the contrary, has expressly sanctioned them, provided they aggregate in value not more than one fourth of one percent of the dealer's net sales, and so long as free samples of milk

or milk products are not given to the grocers: General Order B-6. Judged on the basis of this monetary limitation, it should be observed that the annual amortization cost of the cabinets does not exceed $25 per year. The commission does not dispute the company's testimony that its total free sample and advertising budget, including amortization of the display cases, is well within the limit set by the commission.

There is abundant uncontroverted evidence that the arrangement under which the grocers receive appellant's cabinet is neither intended to, nor has the effect of being a rebate to circumvent, directly or indirectly, the minimum price law and thereby induce the grocers to handle Sylvan Seal milk.

On the contrary, Sylvan Seal encountered considerable resistance to its offer of the refrigerators; for display space in stores is of substantial value, and held at a premium, and grocers preferred to use such space for the display of more profitable items. They already had ample refrigerating capacity, and the offer of additional refrigeration facilities carried little, if any, appeal, especially since the grocers had to pay for the electric current required by the Sylvan Seal cabinets, and were restricted in the use of them to the handling and display of that company's products.

The history of appellant's efforts to develop the use of its cabinets by grocers is instructive, and casts in bold relief what we believe to be the complete absence of justification for the conclusion of the majority of the commission that the furnishing of the cabinets to grocers under the leasing contract would constitute a form of illegal price cutting.

Initially and as an experiment, five grocers were persuaded to test the value of the cabinets as an advertising medium, largely by appeals to their "loyalty" to an organization that was benefiting them by selling milk solely to stores. One of the five later had the cabi-

net removed, and many of the grocers approached refused to have the boxes in their stores. However, the others, who accepted them, found their sales of milk and other Sylvan Seal products increased so substantially that the experiment was regarded as having successfully brought about an average increase of 70 percent in the sale of its milk. The grocers, of course, derived a larger gross profit from that increase, and in this sense the use of the display cabinet tends, as in the case of any other vigorous advertising program, to create an incentive for the grocer to handle Sylvan Seal products. However, so long as it does not, directly or indirectly, involve "price-cutting", it is not only lawful, but is to be encouraged as a desirable expansion of our business economy in that particular field. The same favorable results were also observed in the sale of cheese, Reddi-Wip and other Sylvan Seal products, the profit margin on which is greater than on milk, and which are not within the purview of the price cutting ban of the Milk Control Act.

On this evidence, the commission concluded that Sylvan Seal had been selling milk at less than the lawful price, in violation of the portions of the act and general order in question. Two of the commissioners thought that the contract under which the cabinet was furnished to the grocer constituted, in effect, an illegal price cutting device for selling milk below the established minimum price, and that this conclusion followed inevitably from the reasoning that grocers, paying only the prescribed regular price per quart of milk, would receive more than a quart of milk in return, viz. "a bottle of milk plus the use of an elaborate refrigerating cabinet". The commission also adopted its counsel's contention that if the present transaction is permitted, there would be "no end to what will be given in the future. . . ." Against this conclusion of the majority of the commissioners, Commission Snyder, who

alone heard the testimony in the case, dissented on the ground that the Sylvan Seal display cabinet program was demonstrably increasing the consumption of milk in accord with the dominant purpose of the Milk Control Act.

Before turning to a discussion of the controlling legal question raised by the foregoing facts, we think it will be profitable to get rid of a mass of legal underbrush that only tends to confuse thinking and obscure the main issue in the case. Two of the findings of the commission were not referred to at the argument or in the briefs, and hence may be fairly considered as having been abandoned by the commission. We have given passing consideration to them, however, and find them to be without merit. Finding no. 11 holds that there was a violation of General Order B-6, but there was not a scintilla of evidence that the company had violated any of the trade practices forbidden in that order.

Finding no. 12 also holds that Sylvan Seal violated bulletin no. 284 of the commission, which was a notice addressed to all milk dealers that the commission had received complaints against dealers for furnishing to grocers refrigerating equipment "in an endeavor to attract new business". The dealers were "warned" that this would be prosecuted by the commission as a violation of section 807 and its General Order B-1. Clearly, this bulletin is not a "rule, regulation or order" within the meaning of section 404 (10) of the act, violation of which is a ground for the revocation of a license. It is merely a statement by the commission of its understanding of section 807 and its order. We have given that interpretation the deference due to the opinion of an expert administrative body, taking note, however, of the division of opinion in this case among the commissioners. Nevertheless, it must be recognized that, if the section and order in question

are not susceptible, as a matter of law, of the interpretation placed upon them by the commission, revocation of a license cannot be based on a violation of a mere administrative bulletin. The terms "rule, regulation or order", as used in the Milk Control Act, evidently refer to actions taken by the commission in conformity with the formal requirements on notice and service set forth in sections 307, 308, and 309, and subject to the judicial review prescribed in sections 901-908. The less formal communications of which bulletin 284 is representative serve a very useful purpose, in advising the trade respecting the commission's view on controversial issues in the administration of the act, but such a practice cannot be made a substitute for the formalities properly required to be observed by the commission in its exercise of the power to make legally binding rules, regulations and orders.

With the elimination of these collateral questions, there remains for consideration only the principal issue already stated, namely, whether, in the light of the facts which are established by the evidence taken by the commission and submitted to us on appeal, the furnishing by Sylvan Seal of the cabinets to customers, under the contract in question, is a violation of the Milk Control Act and the general order of the commission issued under it.

The act expressly defines the function of the common pleas court on an appeal from a decision of the Milk Control Commission to be to "determine whether or not the order appealed from is reasonable and in conformity with law": Section 906 of the Milk Control Act; Pennsylvania Milk Control Commission v. Nicoson, 57 D. & C. 166 (Indiana County, 1947). Such an appeal is not a de novo proceeding, and, hence, apart from deciding whether the commission erred in interpreting the law governing the case, we are limited to

determining whether the factual evidence on which it acted reasonably supports its findings. Bearing this in mind, we have reached the conclusion that the decision appealed from cannot stand, first because the evidence does not support its findings, and second, because the commission misinterpreted the language of section 807 of the act. That section does not prohibit every transaction between a milk dealer and his customer where the dealer supplies a service or commodity without charge, regardless of the nature of what is furnished, its value, the purpose of the transaction, its effect upon the customers or the resultant relation between what is given by the dealer and the price he receives from the grocer for milk. None of these can be disregarded in determining whether the law has been violated.

Section 807 does not forbid free services, combination sales, extension of credit or other methods of stimulating the sale and purchases of milk. What it alone forbids is price cutting—the sale of milk at less than the minimum price—when effected by these or other means. The commission itself has recognized this in its own General Order B-6 expressly approving "free samples and other advertising items" in amounts not exceeding one-quarter percent of dealer's net sales. The commission has not objected to dealer's newspaper advertising which lists the names and addresses of stores where the dealer's products may be purchased, although such publicity plainly has value to the storekeeper. Extension of credit without interest is a regular and tolerated feature of the milk business, although it might, of course, be logically regarded as a discount on the price of milk to the extent to which a grocer would thereby save the interest on a like amount borrowed to make immediate payment to his distributor. It certainly could be deemed a price cutting transaction only on a showing that the purpose and effect of

a proposed or particular extension of credit would, or did, result in an actual cutting of prices.

It may be conceded, arguendo, that a contract could be devised leasing a refrigerating machine to grocers without consideration which would in different circumstances become as much a device for selling milk below prescribed prices, as the giving of an out-and-out cash rebate. When, however, the circumstances accompanying and inducing the leasing fairly disclose the existence of a quid pro quo given for the use of the cabinet by the grocer, the element of a device to circumvent the law disappears. The particular transaction under investigation must be appraised as a whole, in order to determine whether price cutting is in reality present in it. At best, the evidence here will support only a finding that the obvious purpose and effect of leasing the cabinet is to stimulate the sale of milk and to influence grocers; by means other than by price concessions, to become, or remain, customers of Sylvan Seal. This necessarily destroys the commission's conclusion that the transaction was a "device or method" for accomplishing the forbidden objective of indirect price cutting. The fact that the offer of the cabinet may have been intended, incidentally, to induce grocers to push the sale of Sylvan Seal products by cultivating their good will cannot, of itself, condemn the transaction as being a reduction in the price of the milk to them. Such an argument is manifestly untenable. Good will holds customers and expands and strengthens business relationships; and the suggestion that it bears any direct or indirect relation to price cutting contains its own refutation and is plainly unworthy of serious discussion. The law has not yet reached the point where, even in milk and other price control legislation, our General Assembly has disclosed a disposition to altogether abolish the employment in business of the traditional and normal methods of private enterprise competition.

The commission evidently realized that appellant's scheme of leasing its display cabinets to grocers is predominantly an advertising program, the value of which to both the appellant and the grocer as a means of increasing sales could not be tortured into a device for evading the minimum price law, for it grounds its principal condemnation of the agreement upon its monetary terms, from which the commission evolved two theories. The first is based upon the assumption that the refrigerating feature of the cabinets releases to the grocer for other uses space in his general refrigerator that would otherwise be used for keeping Sylvan Seal milk, thereby pro tanto enlarging the cold storage plant of the grocer without expense to him, i.e., to the extent of a capital investment of $250 amortized at the rate of approximately $25 per year. The commission held that this constitutes, in practical effect, an annual monetary rebate of that amount on his gross purchases of Sylvan Seal milk. It reached this obviously fallacious conclusion by entirely ignoring the fact that the grocer, rather than receiving the use of appellant's cabinet free of cost to himself, actually pays for that use not only in the added expense incurred by him in providing electric current to operate it, but also by devoting to the exclusive handling in the cabinets of Sylvan Seal products the floor space it occupies in the main part of his store, which would otherwise be available for the effective display of other and perhaps more profitable merchandise—space which has a rental value that may not have been definitely established, but which is at least equal to, if not greater than, that of the space in his general refrigerator which is thus released for other uses. It is incorrect, therefore, to assert that the grocer obtains the use of the cabinet free of expense to himself. In effect, he leases it from Sylvan Seal, not, indeed, by a direct money payment, but by the detriment he suffers through the loss of the use to him for

other purposes of valuable display space in his store. However that may be, there is nothing in the testimony to indicate that the additional refrigeration space thus afforded by the cabinets is of particular pecuniary advantage to the grocers, for they already have facilities to preserve the milk, and, with the loss of space in the store proper, the refrigerating cabinets would become a burden to them, rather than a financial advantage, unless their advertising power effects an increase in sales.

Furthermore, the $25 yearly amortization cost of the cabinet compared to the yearly purchases of milk by a grocer is so inconsiderable as to bring it within the rule "de minimis", as applied by the Supreme Court in Bristol-Myers Co. v. Lit Brothers, Inc., 336 Pa. 81. In that case which was brought under the Fair Practices Act and involved an alleged undercutting of a fixed price, the late Chief Justice Maxey said:

"There is also a time-honored maxim of the law which applies to this case, to wit: 'De minimis non curat lex.' As Broom says in his 'Legal Maxims': 'Courts of justice generally do not take trifling and immaterial matters into account.' In 'The Reward,' 2 Dods. Adm. R. 269, 270, Sir W. Scott observed that 'the court is not bound to a strictness at once harsh and pedantic in the application of statutes. The law permits the qualification implied in the ancient maxim, de minimis non curat lex. Where there are irregularities of very slight consequence, it does not intend that the infliction of penalties should be inflexibly severe. If the deviation were a mere trifle, which, if continued in practice, would weigh little or nothing on the public interest, it might properly be overlooked.' "

The trivial character of the amortization cost becomes even more obvious, if we consider another factor in appellant's proposal to supply its cabinets to gro-

cers, which has been disregarded by the commission. Up to this point, we have been discussing the problem upon the assumption that a grocer must use the cabinet in the handling and sale of milk alone, and hence that the whole amortization cost is in fact a form of rebate on the price of milk. This is not the case. Appellant also sells to grocers other of its products, such as "Reddi-Whip" and cheese that are not subject to the minimum price provisions of the Milk Control Act. Since, therefore, such other products are kept and exhibited for sale in the cabinets, the annual amortization cost cannot be treated entirely as a reduction in the price of milk. Our Supreme Court has held the power of the legislature to restrict competition in one segment of a business does not necessarily carry with it power to restrict competition in another segment of the same business: Hertz Drivurself Stations, Inc., v. Siggins et al., 359 Pa. 25 (1948). At any rate, conceding the legislative power to prevent price-cutting in the wholesale end of the milk business, and to forbid evasions by methods and devices such as free services, it is essential that the commission be cautious not to go beyond the legislature's intent by using the powers granted to it for regulating the price of milk as a tool for regulating the price of cheese and other competitive products that are not subject to the commission's control. The situation is comparable to that of a patentee who has the lawful right to fix the price at which his patented product is sold by a manufacturer licensed under the patent, but who may not for that reason also prevent the licensee from selling associated unpatented products at any price he chooses: United States v. U. S. Gypsum Co., 333 U. S. 364, 399 (1948). To hold that the entire amortization cost of the cabinet operates to reduce the price of milk and that no part reduces the price of appellant's other products would not accord with the

facts, would interfere with appellant's right to cut the price of the latter in any manner it pleases, and would be unjust and inequitable. This consideration only serves to reveal more clearly the de minimus character of the alleged rebate for which the commission attempts to punish Sylvan Seal by revoking its license.

At the risk of unnecessarily laboring a point, it may be observed that the refrigerating feature of the Sylvan Seal cabinet presents, basically, a problem in the packaging of a commodity for the convenience of the purchaser—in this case the grocer—which certainly could not be considered as a form of rebate, even though it might incidentally and remotely be of value to him. Certainly a housewife does not get a rebate every time she buys perishable foods that are precooked, or sold in adequately sealed containers, merely because they do not have to be kept in her ice box until used. It may reduce the dealer's profits to sell the food in that form, but the price to the housewife remains the same. So, also, if a milk dealer were able to deliver his milk to a customer as and when it is needed, the fact that the customer would not have to refrigerate it would not constitute a rebate. Neither would a packaging device be a rebate that would accomplish the same purpose. Hence, if a dealer should succeed in devising a method of delivery of his milk to the grocer in self-refrigerated cases constructed, for example, on the thermos principle, the grocer would be relieved of the necessity of refrigerating it while in his possession. Such an advantage could not by any reasonable stretch of the imagination be viewed as reducing the cost of milk to him, and the refrigerating feature of the Sylvan Seal cabinet is essentially that and nothing more. To hold otherwise would only prevent a dealer from devising and employing an improved method of delivery unless all of his competitors should also adopt it, and would stifle prog-

ress in methods of merchandising. It is clear, therefore, that appellant's cabinet program, which the commission has condemned does not, and cannot, unlawfully cut prices.

The second ground on which the commission attempts to justify its condemnation of the leasing arrangement as a device to sell milk below the minimum price is that, if it is permitted here, "there will be no end to what will be given in the future". Aside from its being a manifest non sequitur, this reasoning to convenience is evidently designed to relieve the commission of the necessity of discriminating between differing factual situations, and suggests that it is the product of fear, or a confession of inability or reluctance to individually appraise the facts in each case that may hereafter arise. Stripped of its subtle camouflage the commission's thesis runs thus: Although this appellant's arrangement with its customers may not actually cut prices in violation of the act and general order, nevertheless some clever and unscrupulous dealer may hereafter succeed in devising a different scheme along more or less similar lines that would actually cut prices; let us, therefore, forbid the employment of this unobjectionable scheme by Sylvan Seal, and thus establish a precedent to make it easier for us to put a stop to other schemes that are undoubted violations. Such an in terrorem argument, based as it is upon the illogical apprehension that approval of this plan will open the door to approval of transactions such as a wholesaler giving the grocers large, general purpose refrigerators, paying their electric bills, or building an entire store front, is utterly groundless. All such transactions are clearly distinguishable from the instant case, for they promote the grocer's welfare and swell his pocketbook generally, like a cash rebate. They do not tend exclusively and directly to increase the sale of the milk dealer's product, an objective which is

clearly one which the dealer is entitled to pursue by advertising his wares; and according to the uncontradicted evidence before the commission, the real value of the display cabinet lies in its advertising power: Bristol-Myers v. Lit Bros., Inc., supra. Until it is shown that a challenged practice violates the milk control law, it is a lawful practice, and the dealer cannot be punished for employing it by the revocation of his license.

And herein lies the vice of the commission's attempt to revoke appellant's license on this ground. We are dealing here with a type of general order which does not forbid a particular practice, but only the price cutting result of a practice regardless of how it is brought about. It is not the validity of the commission's order that is questioned. Indeed, the order cannot be challenged, for it only repeats the language of section 807 of the act, which in general terms, forbids the direct or indirect selling of milk below the fixed minimum price, and we have held that the use of the Sylvan Seal cabinet in the manner proposed does not result in sales below that price. For the commission in these circumstances to attempt to condemn a program that manifestly does not violate the order on the ground that another program might be unlawful, is plainly arbitrary and capricious, and far exceeds the discretionary and judicial power vested in it to revoke licenses.

We do not mean to imply that the commission's action in this respect was prompted by improper considerations. Any challenge to the good faith and integrity of the commissioners in performing their duties would be wholly unjustified. It cannot, therefore, be considered a reflection upon them to point out that this is the kind of reasoning that, in biased and partial hands, might readily be employed to deny a citizen his just rights, or to punish some and favor others. Their error indicates only a mistaken understanding of the proper

interpretation of the provisions of their order, and the extent of the power vested in them for its enforcement. The fundamental principles upon which our system of administering justice is based can no more be ignored by an administrative body charged with the performance of an essentially judicial duty, that it can be by a court of justice. The commission may make orders within the law, but it cannot make laws to support their orders.

Indeed, the existence in one and the same agency of a part of the powers of all the three branches of government, legislative, executive and judicial, that is to say, of the power to proscribe, accuse and condemn, is an anomaly in a democratic system of government, and those entrusted through necessity with such power must exercise it with the utmost restraint, so that precedent, and the notoriously demoralizing influence on mankind of the possession of all forms of essentially unlimited authority shall not encourage the arrogation of powers never intended to be conferred by the legislature. Like a patch on an inner tube, what is popularly but vividly referred to as "bureaucratic government" may, in some instances, be necessary for the control of weak spots in our complex business economy that threaten the public interest. It partakes, however, of the nature of an extraordinary remedy, to be resorted to with reluctance, and sparingly employed, lest by extension and repetition it destroy the entire fabric of our democratic conception of human and individual rights. In every sphere in which it is resorted to, it provides the easiest and most direct road to governmental tyranny and oppression; and it is for this reason that the capricious exercise of such intrinsically dangerous powers by the executive branch of government should be the object of the constant vigilance and stern scrutiny of the judicial branch, for on no other terms can they be safely delegated to an administrative body.

In the light of the foregoing analysis of the fundamental nature and effect of appellant's leasing of the cabinets to grocers, we think it is clear that the revocation of its milk license is wholly unsupported by the evidence, and cannot be sustained.

Accordingly the appeal is sustained, the decision of the Milk Control Commission is reversed, and the case is referred back to the commission with directions to revoke and set aside the order appealed from, and to reinstate appellant's milk license.