Milk Maid Dairy Products, Inc. *v.* Pennsylvania
Milk Control Commission, Appellant.

Argued June 9, 1959. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*John Patrick McShea, Jr.*, Assistant Attorney General, with him *Marvin D. Weintraub*, Assistant Attorney General, and *Anne X. Alpern*, Attorney General, for appellant.

*Bernard L. Frankel*, with him *Donald Brown* and *Robert P. Frankel*, and *Fox, Rothschild, O'Brien & Frankel*, for appellee.

OPINION BY WOODSIDE, J., September 16, 1959:

This is an appeal from an order of the Court of Common Pleas No. 5 of Philadelphia reversing an order of the Pennsylvania Milk Control Commission suspending the milk dealer's license of Milk Maid Dairy Products, Inc., for violating the Rules of Trade Practices which had been established by the commission.

Section 301 of the Milk Control Law of April 28, 1937, P. L. 417, as amended, 31 PS §700j-301, provides: "The commission is hereby declared to be the instrumentality of the Commonwealth for the purpose of administering the provisions of this act and . . . it is hereby vested with power to supervise, investigate and regulate the entire milk industry of this Commonwealth, . . . including the establishment of reasonable trade practices, . . . ."

Carrying out the powers vested in it by this provision, the commission established Rules of Trade Practices effective December 12, 1956, which included the following: "A-1, No licensee under the Milk Control Law shall give or lend to any customer any refrigeration equipment, or milk or cream dispenser of any type for the purpose of storing or dispensing milk or cream, . . . ." The rules originally provided that a fair rental value be charged for refrigeration equipment furnished by the wholesaler, but they were amended on April 17, 1957, to include a schedule of rentals deemed to be fair.

In violation of this rule, the appellee, whom we shall refer to as Milk Maid, lent refrigerator equipment free of charge to 22 of its wholesale customers. The commission cited Milk Maid for these violations and, after a hearing and a finding that it had violated the commission's Rules of Trade Practice, suspended its license for 44 days, permitting it to apply for the right to pay $2200 in lieu of the suspension.

Milk Maid appealed to the Common Pleas Court No. 5 of Philadelphia. In its petition for appeal, it did not deny its violation of the commission's rules. It set forth that it "files this petition for appeal because the Rules of Trade Practices adopted December 12, 1956, and April 17, 1957 by the Commission are invalid and illegal . . . ."

The court below, accepting Milk Maid's contention, held that "the prohibition upon the mere giving or lending of refrigeration equipment contained in Rules of Trade Practices A-1 is unreasonable, patently beyond the necessities of the case and does not have a real and substantial relation to the objects sought to be attained." The commission appealed to this Court.

Former Chief Justice Stern said in *Gambone v. Commonwealth*, 375 Pa. 547, 550, 551, 101 A. 2d 634 (1954), "Probably the most important function of government is the exercise of the police power for the purpose of preserving the public health, safety and morals, and it is true that, to accomplish that purpose, the legislature may limit the enjoyment of personal liberty and property . . . But, . . . a law which purports to be an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained."

We cannot agree with the court below that the commission's rule fails to meet the test of constitutionality set forth above.

The purpose of the Milk Control Law, as stated in its preamble, is to assure consumers a constant and sufficient supply of pure, wholesome milk, primarily through price regulation and control.

Governmental price fixing and its concomitants run counter to the philosophy of free enterprise. They are

not palatable to a people who have confidence in substantial freedom in business and economic as well as in religious and political matters. Governmental control of charges made by private business establishments is confined to a relatively few enterprises, such as utilities, and, to a lesser degree, insurance, or it is applied to unusual situations, such as when a war suspends the economic rules of supply and demand. Many people are understandably annoyed by a law which, establishing the price for a product or service, must say to the businessman who violates the established price, "You are selling your product for less than you should," or "Your product is too good for the price you are charging", or "You are rendering too much service for the price you are charging." But these are concomitants to price control, particular control of minimum prices, and without them there can be no effective price control.

Milk control grew out of, and survived, the depression of the Thirties.[1] The constitutionality of the Milk Control Law, and later the advisability of retaining the statute, were subjects of bitter arguments in and out of the courtrooms and the legislative halls, but now, a quarter of a century after the introduction of milk control into our government and economy, it seems to be firmly established.

Milk control, as the legislature intended it, is founded upon price control.

In the preamble of the Law we find: "Public health is menaced when milk dealers do not or cannot pay a price to producers commensurate with the cost . . . or when consumers are required to pay excessive prices . . . persons have often combined privately to establish

---

[1] The first milk control statute was the Milk Control Board Law of January 2, 1934, P. L. 174 (1933-34 Acts) repealed by the Milk Control Law of 1937, supra.

practices or fix prices to the detriment of producers or consumers." See Act of April 28, 1937, P. L. 417, and Historical Note under 31 PS §700j-101.

A large part of the statute is given to price fixing, and its enforcement. Section 807, as amended, 31 PS §700-j-807 provides, inter alia, "No method or device shall be lawful whereby milk is . . . sold or handled or delivered or made available on consignment or otherwise, . . . at a price less than the minimum price applicable to the particular transaction, whether by any discount, premium, rebate, free service, trading stamps, advertising allowance, or extension of credit, or by a combined price for such milk, together with another commodity or a service which is less, or is represented to be less, than the aggregate of the price of the milk and the price or value of such commodity or service when bought or received or handled on consignment or otherwise, sold or delivered or made available on consignment or otherwise, or offered for sale, delivery, purchase, handling or receiving separately or otherwise."

To maintain an established price, it is necessary to prevent the seller from giving to the purchaser anything of value related to the sale, which is in addition to the product and service for which the price was established. Only by maintaining established prices can milk control survive.

A rule or order of the commission designed to maintain established prices is presumed to be constitutional. The burden is upon the person who challenges the rule to show that it is unconstitutional. The appellee did not meet this burden.

The law requires the commission to fix prices, which include a reasonable return to the milk dealer or handler, and in doing so to utilize a cross-section representative of the average or normally efficient dealers or handlers. See section 801, 31 PS §700j-801, and *Col-*

*teryahn Sanitary Dairy v. Milk Control Commission of Pennsylvania,* 332 Pa. 15, 27, 1 A. 2d 775 (1938).

To do this the commission must ascertain the expenses of the dealer and the handler. The storing and the refrigeration of milk is a necessary expense. As set forth in the preamble to the commission's amended Rules of Trade Practice, "when the store spread was originally fixed by the Commission throughout the Commonwealth of Pennsylvania, one of the motivating factors upon which that spread was, and is predicated was the cost to the store of acquiring refrigeration equipment." If the cost of milk refrigeration in the store is shifted from the store owner to the wholesaler, it is evident that the store owner will make a greater profit and the wholesaler a smaller profit. Furnishing this equipment becomes a device of the wholesaler to sell milk below the fixed price whether or not it is intended as such.

Nor is the amount involved de minimis. Milk Maid admits that it has lent without charge to its milk customers, not only 22, but 114 refrigerators. The cost of these varied, but approximates $400 each. This represents an expense of over $45,000. Even if this sum is amortized over seven years as suggested by the appellee, it is still substantial. There are 800 milk dealers in Pennsylvania, and when we consider that some sell wholesale to thousands of stores, we can see that the cost of refrigeration of milk in retail establishments involves millions of dollars.

The commission is necessarily concerned with this cost of refrigeration, and who is to bear it. Rules relating thereto have a real and substantial relation to the control of milk prices, and it is not unreasonable or unduly oppressive to say that the retailer and not the wholesaler must bear this expense, especially when an allowance for this expense is given to the retailer

and not to the wholesaler in fixing their prices. It is within the commission's power to make *general* rules relating to refrigeration.

In administering the Milk Control Law, it would be impossible for the commission to investigate the cost and size of each refrigerator lent by a wholesaler and the varying percentages of space in each used for milk and for other products and then relate these to the amount of milk sold in order to determine whether lending the refrigerator substantially affects the price of milk in that particular instance.

The evidence in this case, which relates solely to the practices of Milk Maid, does not justify the conclusion that its lending refrigeration equipment has no relation to maintaining an established milk price. But suppose, as Judge GORDON thought in *Sylvan Seal Milk, Inc. v. Pennsylvania Milk Control Commission*, 74 Pa. D. & C. 289 (1951), there was no substantial relationship between maintaining the established milk price and the lending of refrigeration equipment by this particular dealer, that alone would not make the general rule unconstitutional.

It has frequently been held that a transaction which is innocuous if considered separately, may nevertheless be included in the scope of a general prohibitory measure designed to accomplish a purpose within an admitted governmental power. *Commonwealth v. Stofchek*, 322 Pa. 513, 522, 185 A. 840 (1936) ; *Grime v. Department of Public Instruction*, 324 Pa. 371, 383, 384, 188 A. 337 (1936) ; *Purity Extract Co. v. Lynch*, 226 U. S. 192, 201 (1912).

Although we have dealt with the issue passed upon by the court below and presented to us in the briefs of both the appellant and the appellee, nevertheless, as we see it, the issue presented in this case is whether Milk Maid violated the commission's rule. As it admits

the violation, we have no alternative but to reverse the court below and affirm the commission's order suspending the appellee.

Section 901 of the Milk Control Law of April 28, 1937, P. L. 417, supra, 31 PS §700j-901, provides: "Any person aggrieved . . . by any general action, rule, regulation or order of the commission, may, . . . file an appeal therefrom in the Court of Common Pleas of Dauphin County . . ."

Section 902 of the Law, supra, 31 PS §700j-902, provides: "Any person aggrieved by an order of the commission in which the commission . . . suspends, a license to operate as a milk dealer, or by any other order of the commission applying only to a particular person . . . may, . . . file an appeal therefrom in the court of common pleas of the county in which he resides or has his principal place of business, . . ."

Section 908 of the Law, supra, 31 PS §700j-908, provides: "From the decision of a court of common pleas, upon an appeal from an order of the commission applying only to the particular person or persons named therein, an appeal may be taken by either party to the Superior Court of Pennsylvania in the manner provided by law. From the decision of a court of common pleas, upon an appeal from a general rule, regulation or order of the commission, an appeal may be taken by either party to the Supreme Court of Pennsylvania in the manner provided by law."

The procedure followed by the commission in establishing its Rules of Trade Practice is not questioned here. The preamble to the rules indicates that they were adopted only after an investigation and a statewide conference held November 9, 1956, in Harrisburg at which milk dealers and other interested parties participated. We must conclude that the rules were promulgated in strict compliance with the legal requirements.

The evidence here shows that Milk Maid was licensed as a milk dealer, and had given or lent a number of refrigerators to its wholesale milk customers prior to the adoption of the rule as well as subsequent thereto. Milk Maid did not appeal from the establishment of the rules.

The legislature provided a method to be followed by those aggrieved by a general rule of the commission. The Law provides for an appeal to the Court of Common Pleas of Dauphin County and from there to the Supreme Court. Milk Maid chose to await action against it by the commission for violation of the rule, and then attack the rule collaterally in an appeal to the Court of Common Pleas in Philadelphia. It cannot question the reasonableness of the rule collaterally.

In sustaining a conviction of a person charged with selling milk below the price established by the commission, Judge HIRT, speaking for this Court said: "Whether the commission violated the Constitution by exceeding the bounds of reasonableness, in establishing the selling price of milk, is a question which should have been raised at the hearing before the commission or by an appeal from that order. Without an appeal, as provided by the statute, the order became final and the reasonableness of the rate cannot be questioned collaterally." *Commonwealth v. Jackson*, 146 Pa. Superior Ct. 328, 334, 22 A. 2d 299 (1941). The Supreme Court affirmed on the opinion of Judge HIRT, 345 Pa. 456, 28 A. 2d 894.

In *Commonwealth v. Ziegler Dairy Co.*, 139 Pa. Superior Ct. 224, 242, 11 A. 2d 669 (1940), President Judge KELLER said: "Appellant, not having availed itself of the means and measures supplied by the legislature for a direct attack upon the lawfulness of the order, cannot two years later present the same grounds collaterally by way of defense to a proceeding brought against it for violation of the order."

The reason for requiring strict compliance with this rule is evident in the appeal now before us. First, the evidence to establish the reasonableness of the rule and that necessary to establish the guilt of an alleged violator differ materially. To properly pass upon the reasonableness of the rule, we should have before us the evidence which was before the commission and upon which it acted when it adopted the rule, or at least evidence of a similar nature. Second, appeals from the establishment of general rules are to different courts than appeals from the suspension of licenses. The constitutionality of a general rule applicable to all milk dealers is here declared null and void by a court of common pleas in Philadelphia, and we are asked to pass upon it. The legislature gave the Court of Common Pleas of Dauphin County initially, and the Supreme Court finally, exclusive jurisdiction to pass upon the validity of all general rules, regulations and orders of the commission.

The order of the court below is reversed, and the order of the commission is reinstated.

ERVIN and WATKINS, JJ., dissent.