## Formula Method of Establishing Milk Prices

JACKSON, Deputy Attorney General, May 24, 1951.
—You requested this department to advise you as to
the legality of adopting a formula method of estab-
lishing a price for class 1 milk under the Pennsylvania
Milk Control Law of April 28, 1937, P. L. 417, as
amended, 31 PS §700$j$-101 et seq.

In this connection no question is raised as to whether
the commission should or must fix prices by the for-
mula method, but only whether it can do so within the
body of the law.

In order fully to understand the problem, it should
be stated that since the earliest days of the control of
milk prices by States and later by the Federal Govern-
ment there have been two methods in force by which
the exact dollar price at any given time to be paid to
a producer was fixed. The first and simplest of these
methods was to fix an exact dollar price for a class of
milk. For example, class 1 milk (for human consump-

tion as milk) would be priced, f.o.b. Philadelphia, at $4.84 per hundredweight.

The other method was to insert in the order a formula which, by applying the factors of the formula, could at any given moment be translated into an exact dollar price. These formulae in the case of class 2 and class 3 milk were usually based upon a combination of factors. These factors included such items as the open market quotations for a 40-quart can of 40 percent butterfat content sweet cream, the average quotations for hot roller processed dried skimmed milk, the market price of 92 score butter at New York, etc. The practice has been for the commission to, from time to time, send out notices of exactly what the dollar price was under these formulae.

Section 801 of the Milk Control Law deals with "requisites of orders fixing price of milk". The first four paragraphs of section 801 read:

"Requisites of Orders Fixing Price of Milk.—The commission shall ascertain, after a hearing in which all interested persons shall be given reasonable opportunity to be heard, the logical and reasonable milk marketing areas within the Commonwealth, shall describe the territorial extent thereof, shall designate such areas by name or number, and shall ascertain and maintain such prices for milk in the respective milk marketing areas as will be most beneficial to the public interest, best protect the milk industry of the Commonwealth and insure a sufficient quantity of pure and wholesome milk to inhabitants of the Commonwealth, having special regard to the health and welfare of children residing therein.

"The commission shall base all prices upon all conditions affecting the milk industry in each milk marketing area, including the amount necessary to yield a reasonable return to the producer, which return shall not be less than the cost of production and a reason-

able profit to the producer, and a reasonable return to the milk dealer or handler. In ascertaining such returns, the commission shall utilize a cross-section representative of the average or normally efficient producers and dealers or handlers in the area.

"The commission shall file at its office, with each order issued, a general statement in writing of the findings of fact in support of, and the reasons for such order.

"The commission may, upon its own motion or upon application in writing, from time to time, alter, revise or amend an official order defining milk marketing areas or fixing prices to be charged or paid for milk. Before making, revising or amending any order defining milk marketing areas or fixing prices to be charged or paid for milk, the commission shall hold a hearing, after giving reasonable opportunity to be heard to interested persons, of whom the commission has notice, and, in the case of any order affecting the public, after giving reasonable notice thereof to the public in such newspaper or newspapers as, in the judgment of the commission, shall afford sufficient notice and publicity: Provided, however, That after such hearing, there shall be a further hearing or conference before the commission on any proposed order, and notice of such further hearing or conference shall be given to the parties represented and heard at the previous hearing. Upon application in writing from a person aggrieved by an order of the commission hereunder, filed within fifteen (15) days after the issuance of the order complained of, or upon its own motion, the commission may, within twenty (20) days after the effective date of such order, issue an order revising or amending such order without a further hearing, if such revision or amendment is based on the record of the hearing held prior to the issuance of such order."

It is the opinion of this department that the Milk Control Commission has legal authority to adopt a formula method of pricing for class 1 milk, *providing* such formula at all times complies with the requisites of price fixing outlined in section 801 above. That is to say that providing the formula applicable to a given marketing area, at any given time, establishes a price which is (a) most beneficial to the public interest, (b) best for the milk industry of the Commonwealth, (c) insures a sufficient quantity of pure and wholesome milk to the inhabitants, (d) considers all conditions affecting the milk industry, (e) yields a reasonable return (not less than costs of production and reasonable profit) to the producer, and (f) a reasonable return to the milk dealer or handler.

It should be understood that the power to set the price of class 1 milk under a formula method in no way obligates the commission to use this method. It is merely one method that the commission may use, providing such a method complies with all other requirements embodied in section 801, supra.

It should also be understood that the voluntary establishment of a formula pricing, subject to a hearing, could not abrogate the rights of the commission or any interested person, as defined under paragraph 4 of section 801, to apply for a new hearing to set prices by formula or otherwise. The right of hearing, as set forth in the section, remains inviolate; first, to determine the formula, second, to alter, revise or amend the formula, third, to apply for a new hearing to set prices for a new formula or otherwise, as above stated, and fourth, if necessary, to suspend the formula.

This, however, does not mean that the hearing must be held before a price determined by formula is applied. To so hold, would render the formula unnecessary. What it does mean is that, under section 801,

supra, the commission may adopt and use a formula in fixing the price of milk, but such formula could not be made the exclusive test, and consideration will still have to be given to special facts or conditions which arise at different times or in different areas.

We are impressed with the statement made by the report of the Philadelphia Class 1 Milk Price Commission, issued in June 1949, excerpts of which are as follows:

"The committee recommends a combination of hearings and a formula to determine class 1 prices. . . . It also recommends that class 1 prices be adjusted seasonally as an incentive for more uniform production than has existed during recent years.

"The formula would serve two purposes. The first of these would be as a mechanism for making price changes promptly, whenever needed, between two regularly scheduled hearings. The second would be to indicate prices to be considered at hearings.

"The hearings would be used to determine the level of the price at which the formula would start, to check the formula price at regularly scheduled intervals and to alter the formula as experience in its use and more information makes possible a better selection and weighting of formula components."

The word "price" is defined in section 103 of the act which reads:

" 'Price' includes the amount paid or to be paid and the proceeds returned or to be returned, whether the transaction be one of purchase, sale, consignment, sale or return, accounting, or otherwise."

There is no magic in the above definition. The price may be set by formula or otherwise, providing section 801 is complied with. In sections 301 and 302 the legislature granted to the commission broad plenary powers:

"Regulation of Milk Industry.—The commission is hereby declared to be the instrumentality of the Commonwealth for the purpose of administering the provisions of this act and to execute the legislative intent herein expressed, and it is hereby vested with power to supervise, investigate and regulate the entire milk industry of this Commonwealth, including the production, transportation, disposal, manufacture, processing, storage, distribution, delivery, handling, bailment, brokerage, consignment, purchase and sale of milk and milk products in this Commonwealth, and including the establishment of reasonable trade practices, systems of production control and marketing area committees in connection therewith: Provided, however, That nothing contained in this act shall be construed to alter, amend or repeal any of the laws of this Commonwealth relating to the regulation of public utilities, or to the public health or to the prevention of fraud and deception, except as herein otherwise specifically provided. (As amended July 24, 1941, P. L. 443.)

"Specific Powers not Impairment of General Powers.—The operation and effect of any provision of this act conferring a general power upon the commission shall not be impaired or qualified by the granting to the commission by this act of a specific power or powers."

The legislature authorized and directed the commission to act as the regulatory agency of the entire milk industry. The above two sections make it quite clear that the legislature intended to give and did give the commission complete and absolute regulatory powers within the milk industry.

The constitutionality of milk control legislation was tested in the case of Rohrer v. Milk Control Board, 322 Pa. 257 (1936). This case was followed by Colteryahn Sanitary Dairy v. Milk Control Commission, 332 Pa. 15 (1938). The Colteryahn Case has been since

that time a sage guide to the Milk Control Commission in the methods of administering the law. The case grew out of an appeal from General Order No. A-18 concerning the Pittsburgh milk marketing area. In this order the commission had divided milk into the following classes: Class 1, milk for human consumption as milk; class 1A, milk used in cream for human consumption; Class 2, milk utilized for manufacturing purposes; class 3, milk used in butter; classes 4 through 7—milk used for various other manufacturing purposes.

In this general order a formula (in contradistinction to a dollar and cent per hundredweight price) was used for the pricing of all classes with the exception of class 1. These formulae in the various classes differed in their nomenclature but in any case the entire formula procedure for price setting came before the Pennsylvania Supreme Court. Mr. Chief Justice Kephart specifically used the word "formula" when he said, at page 33:

"The Commission's reports or statements accompanying its orders discussed the different classifications of milk, and the prices for classes 1 and 1-A, with a certain price *formula* for other classes. It did not set forth sufficiently the basis upon which these prices were fixed, except possibly for the market prices of the lower grades. Nor do we find in the evidence data upon which producers' return could be legally predicated. We assume that the various prices were fixed on the basis that all grades were interdependent, and upon inadequate information before the Commission as to the dealers' position. Without the assistance of the dealers in helping to solve this problem the Commission was no doubt embarrassed. We have read with interest its report on this feature, and it must be understood in the future that neither dealers nor producers can withhold from the Commission any books,

record or assistance which will aid it in reasonable price-fixing." (Italics supplied.)

There can be no doubt but that Justice Kephart was cognizant and appreciative of the fact that the commission had used a "formula" in setting and determining all prices other than class 1. The Supreme Court remanded the entire record to the commission for taking of further evidence but in no place in the entire exhaustive opinion did Justice Kephart find fault with the formula method of price fixing. Since this time the commission has regularly in all milk marketing areas used a formula method of pricing for other than class 1 milk. There is nothing distinctive in class 1 (in contradistinction to the lower classes) to prevent the use of a formula, providing the formula complies at all times with the other requirements of the Milk Control Law.

Section 802 of the Pennsylvania Milk Control Law deals, inter alia, with "retail prices". In this section the legislature *directs* the commission to fix minimum wholesale and retail prices and *authorizes* the commission to fix maximum wholesale and retail prices. The commission could without undue hardship set minimum retail prices, on a formula basis or on a dollar basis, with alternative retail schedules moving up or down with the fluctuations of the formula. The commission has in times past carried on a "seasonal pricing program". By this program the commission, subsequent to a single hearing, has issued one general order covering two, three or four quarters of a succeeding 12 calendar months. One schedule of prices in the order designated the wholesale price for January, February, and March; another schedule fixed the prices for April, May and June, etc. There is no reason why this same system could not be carried further in a joint arrangement between wholesale and retail formula pricing.

In conclusion, it seems clear that the legislature of the Commonwealth empowered the commission to use a formula pricing plan, but also vested in the commission the power to use its judgment as to the merit of establishing prices by a formula.

We are therefore of the opinion, and you are accordingly advised, that the Milk Control Commission has legal authority for adopting a formula method of establishing a price for class 1 milk, in accordance with the provisions of the Pennsylvania Milk Control Law, provided, of course, it has first afforded all interested parties the right to be heard.

The hearing thus afforded should consider all questions and items: (a) most beneficial to the public interest; (b) best for the milk industry; (c) a guaranty of a sufficient quantity of pure and wholesome milk to the inhabitants; (d) conditioned upon everything affecting the milk industry; (e) capable of yielding a reasonable return to the producer, and (f) capable of yielding a reasonable return to the milk dealer or handler.