Milk Control Board of the Commonwealth,
Appellant, *v.* Eisenberg Farm Products.

Argued June 17, 1938.  Before KEPHART, C. J., SCHAF-
FER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

The facts are stated in the opinion of the court below, by SHEELY, P. J., specially presiding, in part, as follows:

"In the present case, the defendant operates a milk-receiving plant at which it buys milk brought to the plant by the farmer-producers. The milk is weighed and tested by the defendant and is then dumped into receiving tanks where it is cooled for the sole purpose of preventing growth of bacteria during shipment. Within a period of twenty-four hours after the milk is received at the plant it is shipped to New York City in tank trucks operated for the defendant for resale in that city.

"The plaintiff bases its right to require the defendant to secure a license and to submit to its regulations solely on the ground that the contract between the Pennsylvania farmers and the defendant, a Pennsylvania corporation, consists of an offer and an acceptance, both made in Pennsylvania, which contract is completely performed by both parties within the Commonwealth of Pennsylvania, and is entirely an intrastate transaction. The defendant admits the right of the plaintiff to control the production of the milk. The plaintiff concedes that it has no right to control the milk after it has started its journey to New York, so that the sole question before us is whether the act of purchasing milk in Pennsylvania under the circumstances of this case can be so separated from the transportation of the milk to New York as to constitute a separate transaction, purely intrastate in its nature.

"The courts have frequently recognized that a business may consist of two activities, one intrastate and one interstate. Thus, in *Utah Power & Light Company v. Pfest*, 286 U. S. 165 (1931), it was held that the production of electrical energy was intrastate while the transmission of that energy into other states was interstate. Also, in *Champlin Refining Company v. Corporation Commission*, 286 U. S. 210 (1931), it was held

that oil production was intrastate while the shipping of oil to other states was interstate. Again, in *United States v. Butler*, 297 U. S. 1 (1935), it was held that agricultural production was exclusively a matter of state regulation, notwithstanding the subsequent shipment of that commodity in interstate commerce.

"More recently, in *Carter v. Carter Coal Company*, 298 U. S. 238 (1936), the Supreme Court of the United States, referring to the mining of coal, said: 'So far as he produces or manufactures a commodity, his business is purely local. So far as he sells and ships, or contracts to sell and ship, the commodity to customers in another state, he engages in interstate commerce. . . . Mining brings the subject matter of commerce into existence. Commerce disposes of it.'

"The doctrine of these cases, relied upon by the plaintiff, as applied to the present situation would be that the 'production' of milk by the farmers is a matter of local concern, a theory admitted by the defendant. These cases do not fix the exact point at which the transaction becomes interstate in its nature.

"We do not believe that the making of the contract for the purchase of the milk can be so separated from the entire transaction as to subject it to local regulation without affecting the interstate business. The facts in the present case are nearly identical with the facts presented in the case of *Lemke v. Farmers' Grain Co.*, 258 U. S. 50 (1921).

"In the present case the agreed statement of facts stipulate that 'none of the milk purchased by the defendant corporation at its Elizabethville plant as aforesaid, is sold within the Commonwealth of Pennsylvania, but all of it is sold as heretofore stated in the State of New York.'

"In a similar case, involving practically the same facts, the Court said: 'Buying for shipment, and shipping, to markets in other states, when conducted as before shown, constitutes interstate commerce,—the buy-

ing being as much a part of it as the shipping': *Shafer v. Farmers Grain Co.,* 268 U. S. 189 (1924).

"The same rule is expressed in *United States v. Seven Oaks Dairy Co.,* 10 F. Sup. 995 (1935), by Judge BREWSTER of the District Court of Massachusettes in a case brought by the United States against the Company seeking to restrain it from engaging in the milk business because of its refusal to comply with a federal milk license. The defendant purchased all of its milk in Vermont with the intention of shipping it into Massachusetts. The milk produced in Vermont was delivered to the Company's receiving station in Vermont and was then dumped, tested, weighed and cooled. The milk was then placed in cans and shipped into Massachusetts within forty-eight hours after its receipt by the Company. The Court said: 'It is settled law that the purchase of a commodity in one state for the purpose of transporting it to another state is a transaction in interstate commerce within the Commerce Clause of the Constitution and not subject to burdens imposed by state regulations. . . . The purchase is none the less a part of the interstate commerce because of the method of receiving deliveries adopted by the defendants. The intermediate deliveries by the purchasers to the defendants' receiving station did not end the movement of the commodity. It was merely halted as a convenient step in the process of getting it to its final destination.'

"Under the authority of these cases we are of the opinion that the entire activity of the defendant as set forth in the Case Stated constituted interstate commerce and that for the purpose of regulation, the purchase of the milk cannot be separated from its transportation.

"The plaintiff insists, however, that even if the defendant is engaged in interstate commerce it is required to secure a license from the plaintiff and to post a bond with the Commonwealth as collateral security for the payment of milk purchased and to pay purchasers cer-

tain minimum prices under the regulations and control of the plaintiff, on the theory that such regulation by the state is a valid exercise of its police power, and that such power rises above the right of the Federal Government to control interstate commerce, or, at least, exists until the Federal Government exercises some control over the subject matter.

"The case of *Townsend v. Yeomans*, reported in the Advance Opinions of the Lawyers Edition of the United States Supreme Court Reports, Vol. 81, No. 16, page 840, is strongly relied upon by the plaintiff as authority for the proposition that where a matter admits of diversity of treatment according to the special requirements of local conditions, the states may act within their respective jurisdictions until Congress sees fit to act. This, however, does not permit a state to regulate or to place a burden upon interstate commerce, and the Court clearly indicated that the state statute there under consideration did not impose such burden. The Court said (page 847) : 'We find no ground for concluding that the state requirements lay any actual burden upon interstate or foreign commerce. The Georgia Act does not attempt to fix the prices at auction sales or to regulate the activities of the purchasers. The fixing of reasonable maximum charges for the services of the warehousemen in aid of the tobacco growers does not militate against any interest of those who buy. They pay the bid price, as accepted, and the warehouseman pays the seller, deducting from the purchase price the warehouse charges.'

"This quotation clearly differentiates *Townsend v. Yeomans*, from the present case. Here, if the defendant is subject to the control of the plaintiff, it would be required to pay the milk producers not the agreed price, but the price fixed by the plaintiff. It would also be required to post a bond to secure payment to the producers of the prices fixed by the plaintiff and would be required to pay license fees. The cost of the milk to it

would be increased by the premium on the bond, by the license fee, and by the increase in price ordered by the plaintiff. The effect of such regulation and such price fixing would be exactly equivalent to the imposition of a tax on the export of milk.

"The regulation here sought to be imposed is very similar to the regulation sought to be imposed in *Lemke v. Farmers' Grain Co.*, 258 U. S. 50, 66 L. Ed. 458 (1921), supra. There, after outlining the control to be exercised under the State Act the Court said: 'That is, the state officer may fix and determine the price to be paid for grain which is bought, shipped and sold in interstate commerce. That this is a regulation of interstate commerce is obvious from its mere statement.'

"Again, in *Shafer v. Farmers Grain Co.*, 268 U. S. 189, 69 L. Ed. 909 (1924), supra, the state statute required every buyer to give to the state a bond securing payment for all wheat purchased on credit, to keep records of his transactions, and to furnish such data to the state authorities. It also required a state supervisor to investigate and supervise the marketing of grain for the purpose of preventing various things which were deemed unjust and fraudulent, and authorized him to make rules and regulations to carry out the provisions of the Act. The Court said (page 915) : 'We think it plain that, in subjecting the buying for interstate shipment to the conditions and measure of control just shown, the act directly interferes with and burdens interstate commerce, and is an attempt by the state to prescribe rules under which an important part of such commerce shall be conducted. This no state can do consistently with the commerce clause.'

"The plaintiff seeks to distinguish these North Dakota grain cases on the ground that in North Dakota 90% of the wheat produced was sold in other states whereas only 10% of the milk produced in Pennsylvania is so sold. Undoubtedly, the laws of Pennsylvania relating to milk control were not enacted for the primary

purpose of regulating interstate commerce, but if they have that effect they are invalid as applied to such interstate commerce regardless of the proportion which such commerce bears to the total commerce of the state. Nor do we agree that these cases have been overruled by *Townsend v. Yeomans,* supra, as the Court in that case carefully distinguishes the North Dakota Grain cases.

"The plaintiff further calls our attention to Section 808 of Act No. 105, approved April 28, 1937, wherein it is declared to be the legislative intent that the prices prescribed by the Commission for milk produced in this Commonwealth and sold in this Commonwealth for shipment into and sale in another state shall not be destructive of the price structure of producers in such other state. The effect of price fixing upon the price structure of producers in other states, however, is not the criterion. The test is whether the regulation and the price fixing amounts to a regulation of interstate commerce and places a burden upon it. If it does, it is beyond the power of the state and cannot be sustained. The effect of a state statute fixing prices as applied to a sale in interstate commerce is tersely stated by Justice CARDOZO in *Highland Farms Dairy, Inc., v. Agnew,* 81 L. Ed. 514, 518 (1936), as follows: 'Highland in Washington may sell to High in Virginia and High may buy from Highland, at any price they please.'

"However desirable it may be for the Pennsylvania Milk Control Board to stabilize the dairy industry, and however necessary it may be for it to regulate the transactions of the defendant and other buyers of milk similarly engaged to effect this purpose, we conclude that the effect of the present statute would be to regulate and to place a burden upon interstate commerce.

"In the opinion of the exceptions the court said: 'In *Townsend v. Yeomans,* 81 L. Ed. (1937), the Supreme Court was considering an act of the Legislature of Georgia prescribing the maximum charges which could be made by warehousemen for the handling of tobacco.

Under the method of handling tobacco in Georgia, the tobacco is brought to the warehouses by the seller and there sold to buyers who immediately ship the tobacco to other states. Payment for the tobacco is made to the warehouseman who deducts his charges and remits the balance to the sellers. The act had no relation whatever to the buying and selling of tobacco and was distinguished by the Supreme Court from the Farmers Grain Company cases by showing that the "Georgia Act lays no constraint upon purchases in interstate commerce, does not attempt to fix the prices or conditions of purchases, or the profit of the purchasers. It simply seeks to protect the tobacco growers from unreasonable charges of the warehousemen for their services to the growers in handling and selling the tobacco for their account. Whatever relation these transactions had to interstate and foreign commerce, the effect is merely incidental and imposes no direct burden upon that commerce." '

"The distinction between *Munn v. Illinois, Townsend v. Yeomans,* and the other cases relied upon by the plaintiff, on the one hand, and the Farmers Grain Co. cases and the present case, on the other, lies in the fact that in the former the regulation was confined to warehouses, elevators, or other agencies through which interstate commerce might flow, but whose activities were entirely intrastate. In the latter cases the statutes sought to regulate the act of purchasing articles which were to be shipped in interstate commerce, and to prohibit such purchases unless made upon terms prescribed by the statute or by administrative agencies. It is not the milk-receiving plant operated by the defendant that the plaintiff seeks to regulate, but the business conducted by the defendant of buying and shipping milk. The very purpose of the Milk Control Law of Pennsylvania as stated in Section 101 of the Act is 'regulating and controlling the milk industry in this Commonwealth, for

42

the protection of the public health and welfare and for the prevention of fraud.' "

*Harry Polikoff,* Deputy Attorney General, with him *Guy K. Bard,* Attorney General, and *Charles J. Ware,* Assistant Deputy Attorney General, for appellant.

*Thos. D. Caldwell,* of *Caldwell, Fox & Stoner,* for appellee.

OPINION BY MR. CHIEF JUSTICE KEPHART, June 30, 1938:

Before passing on the questions presented to the court below as to whether the legislature may, through the Milk Control Law, prescribe certain regulations such as licensing, bonding and minimum prices for producers or dealers in the milk industry, effective where the product is purchased and destined for interstate commerce, we must first decide whether these provisions are valid police regulations under our Constitution. If they are not, then the questions under the commerce clause of the Federal Constitution need not be considered.

We have held in *Colteryahn Sanitary Dairy v. Milk Control Commission,* and *Keystone Dairy Co. v. Milk Control Commission,* 332 Pa. 15, that the Act of January 2, 1934, P. L. 174, and the Acts of April 30, 1935, P. L. 96, and April 28, 1937, P. L. 417, amending and reënacting its provisions, are constitutional. See *Rohrer v. Milk Control Board,* 322 Pa. 257, where it was held that licensing and price-fixing had a direct and substantial relation to sanitation, public health and public welfare. While bonding was not specifically mentioned, it was listed and necessarily included as it was one of

the questions in the case. It was conceded at the argument in the present case that the Court could take judicial notice of the fact that licensing and bonding do bear a necessary relation to the preservation and continuation of an adequate supply of pure milk, a necessary article of food in the State, and are in the interest of sanitation and public health.

These provisions are also a protection against the danger of fraud to the producer and public so well described by President Judge KELLER in *Rohrer v. Milk Control Board,* supra. Such regulations, tending to prevent strikes and the dumping of the product on the market, harmful to the public; to provide a fair price and secure its payment, are necessary to prevent cutting off the supply to the public and to assure its purity and necessary quality. With this end in view the bonds are required as securities for the extension of credit by producers, to prevent fraud and imposition on them, and to eliminate irresponsible and dishonest dealers who are a constant menace to the consuming public. Bonding is therefore related to this legitimate purpose, which is a proper exercise of the police power. Moreover, this Court has held that the legislature may constitutionally require bonds in other industries affected with a public interest to secure payment to subcontractors, mechanics, laborers and materialmen, because of the very elements of fraud prevention, and the inability, otherwise, of those to be benefited to procure payment or credit. See the opinion of Justice SIMPSON, in *Commonwealth v. Great American Indemnity Co.,* 312 Pa. 183, at 196.

The court below has adequately covered in its opinion all questions involved, and has passed on the federal issues under the decisions of the Supreme Court of the United States. The portion of the opinion relating thereto is printed in the Reporter's Note. While we have felt, and still feel, that state laws regulating transactions incidental to interstate commerce, but designed to protect the health, safety, or welfare of the public,

44

are proper state regulation where the transaction which is the origin and beginning of the commerce, is peculiarly within the state's domain, the Supreme Court of the United States in the case of *DiSanto v. Pennsylvania,* 273 U. S. 34, and other cases, has held that such regulations are a burden on interstate commerce and that the states are forbidden to legislate thereon even though the Federal Government has taken no steps to protect the public from the danger of fraud. The Commonwealth earnestly argues that the effect of these decisions should be changed. We are controlled by them on matters affecting interstate commerce.

Decree affirmed at appellant's cost.