## Milk Maid Dairy Products, Inc. v. Pennsylvania Milk Control Commission

*Marvin D. Weintraub,* for appellant.

*William D. Morgan,* and *Anthony W. Novasitis, Jr.,* Assistant Attorneys General, for appellee.

KREIDER, J., October 30, 1964.—This matter comes before the court on an "Amended Petition Sur Appeal" filed by Milk Maid Dairy Products (hereinafter called "Milk Maid"), from certain sections and provisions of Official General Order No. A-632, effective April 1, 1964, of the Milk Control Commission of the Commonwealth of Pennsylvania (hereinafter called the "Commission"). This appeal is taken under the Act of April 28, 1937, P. L. 417, art. IX, sec. 901, 31 PS §700j-901. Specifically, Milk Maid complains that it is aggrieved by section E, provisions 3, 5 and 7 of the order and the schedules of minimum prices made a part thereof. The parties have stipulated, however, that "no appeal is taken from that part of the Order fixing prices charged or paid to producers by and from milk dealers."

It appears from the pleadings and from the record made before the commission that Milk Maid is a licensed distributor of milk in the City of Philadelphia in an area designated by the Commission as Milk Marketing Area No. 1. It is not a producer or processor of milk as such, but confines its operations to the purchase and distribution of already packaged fluid milk. Milk Maid provides its own distribution facilities in the sale at wholesale of this milk to stores and other wholesale customers. Milk Maid does not sell milk at retail or make home delivery of milk.

In count I of its amended petition sur appeal, Milk Maid avers:

"(e) The quantity of milk upon which the Commission sets a price and upon which all other prices are based is the one-half gallon container of milk.

"(f) The type or class of milk of which the greatest volume of sales is made is Standard Milk, Plain, Homogenized and/or Vitamin D added.

"(g) The schedules made part of Official General Order No. A-632, fixing wholesale prices, provide that for the periods indicated, 'half gallons of standard milk, plain, homo or vit. D.' shall be; for milk sold to stores, or the minimum wholesale prices, without discount is:

| I. | II. |
|---|---|
| "January Thru March July Thru December | April, May and June |
| 47.5¢ | 45.5¢" |

Section E, provision 7 of the order provides that the minimum prices charged by or paid to processing milk dealers by other milk dealers, e.g., Milk Maid "shall be 15 per cent less than the appropriate wholesale prices without discount as set forth in schedules 1 and 2 of the Section." In other words, Milk Maid is given a gross profit of 15 per cent on the milk which it purchases from the processor dealers and resells at wholesale. From April through June this amounts to 6.825 cents per half-gallon, 15 percent of 45.5 cents. Milk Maid does not contest this portion of the order.

Provision 5 of section E of the order, however, directs that any wholesale purchaser of milk is entitled to a per unit, half-gallon, discount from the minimum wholesale prices established in schedules 1 and 2 in the amount of 5 cents per half-gallon for a 250-299 half-gallon unit delivery and 6 cents per half-

gallon for a 300 or over half-gallon delivery. Milk Maid claims that when it makes a delivery in the 250 to 299 category, its gross profit is cut from 6.825 to 1.825 cents per half-gallon unit and in the 300 or over category from 6.825 to 0.825 cents per half-gallon.

The thrust of Milk Maid's appeal is directed at this last provision. It is contended that such a narrow gross margin of profit is insufficient to meet employes' wages, officers' salaries, plant and delivery expenses and other operating and general expenses, to say nothing of a profit for stockholders. Milk Maid, though represented at the hearing before the commission, offered no testimony but now alleges that it had a fixed minimum cost of 14 percent of the sales price of the unit for delivery alone. Milk Maid contends that under all the evidence the order as applied to it is confiscatory, arbitrary and unlawful.

In the second count of its petition sur appeal, Milk Maid challenges that portion of the order, provision 3 of section 3, which raises the *minimum* retail prices for milk purchased at *stores* from 45.5 cents to 48 cents per half-gallon and for *home delivery* from 48 cents to 52 cents per half-gallon. Milk Maid maintains that while the new differential between store-bought and home-delivered milk represents an increase from 2.5 cents to 4 cents, nevertheless, the differential in fact has been decreased. This novel situation results, Milk Maid says, from the fact that in actual practice, home delivered milk *previously* had been sold at a price *higher* than the former official minimum price of 48 cents per half-gallon, viz., for 52 cents, while the stores continued to sell at the official *minimum* price of 48 cents per half-gallon. Consequently appellant contends that the former differential between home delivered and store-sold milk actually *had been 6.5 cents* but is now only 4 cents officially. This new official differential, Milk Maid argues, gives undue protection to

dealers delivering milk to the home of the consumer and thereby unjustly restricts competition by wholesale milk dealers who sell only to stores. Appellant's theory seems to be that the consumer now will have less incentive to purchase milk at the store where formerly he could buy it for 6.5 cents less than if delivered to his home and that since appellant sells only to stores it is entitled to be protected from an alleged impending loss of business due to a decrease in store sales.

As above stated, the thrust of Milk Maid's argument in this appeal is that the commission's order is arbitrary, unreasonable and confiscatory and constitutes a deprivation of property without due process of law in violation of the Fourteenth Amendment to the United States Constitution and the Constitution of Pennsylvania. This broadside attack is substantially modified, however, by the argument in appellant's brief which emphasizes principally the insufficiency of the evidence and the lack of opportunity to cross examine witnesses on certain items of evidence. Appellant enumerates the "Questions Involved" as follows:

"1. When the Milk Control Commission determines that labor contracts are the best evidence of increased labor costs, and over the objection that to so do would deny the parties the right to cross-examination, the Commission directs that such contracts be submitted to the Commission after the close of the hearing, and then utilizes them as evidence upon which to base its Findings and Order, is not the appellant deprived of due process of law and may an order so written be permitted to stand?

"2. When milk dealers recommend that prices be fixed as between dealers and sub-dealers, but produce no evidence to support the recommendation, and the Commission, adopts the recommendation of the dealers even in the absence of evidence, but utilizes the recom-

mendation to fix prices for all dealers, rather than just sub-dealers as recommended, is not such a price-order void and illegal?

"3. May the Commission fix wholesale quantity discounts in the absence of evidence of the cost of such discounts to the dealers; and fix prices for products generally and prices for cream in particular without any evidence in the record to support such prices?"

Specifically, Milk Maid objects to the commission's finding of fact no. 14 which was considered in conjunction with its order raising the retail price of milk and cream. It is as follows:

"14. By reason of labor contracts providing for increases effective October 1, 1962; January 1, 1963; July 1, 1963; January 1, 1964; April 1, 1964, and October 1, 1964, the 26 fluid dealers referred to in Finding No. 12, will experience increased labor costs, an analysis of which is set forth in the following schedule:

*Increased Labor Costs*

| *Effective Date* | *Amount of Increase* |
|---|---|
| October 1, 1962 | $1,922,184 |
| Jan. 1, 1963 | 91,503 |
| April 1, 1964 | 1,385,067 |
| October 1, 1964 | 225,996 |
| Total | 3,624,750 |

Adjustments:

| | | |
|---|---|---|
| Amount included in 1962 statement | $569,379 | |
| Non-controlled products & outside sales 18.11 per cent | 553,328 | 1,122,707 |
| Net Labor Increase | | $2,502,043" |

The "labor contracts" referred to in finding of fact no. 14 and which are relied on by the commission to support its order were not introduced in evidence at the hearing. Consequently, they were not subject to cross examination in regard thereto. Milk Maid contends that this constitutes a lack of due process and therefore the entire order must be invalidated, except as to the price paid to producers.

The Milk Commission, on the other hand, attacks the appeal by challenging Milk Maid as a properly aggrieved party to appeal from such an order. The commission argues that even if Milk Maid is a proper party on appeal, nevertheless, on the evidentiary question of the right to cross examine, Milk Maid did have an opportunity to cross examine the commission's witness, Mr. Harbison, when he referred at the hearing to his "survey" of the labor contracts. The commission further contends that Milk Maid failed in its burden to submit evidence of its own on this question.

## I.
### *Is Milk Maid a Proper Party on Appeal?*

The Act of April 28, 1937, P. L. 417, art. IX, sec. 901, 31 PS §700j-901, provides, in part, as follows:

"Any person *aggrieved* by an order of the Commission . . . may . . . file an appeal . . ."[1]

The commission contends that appellant's petition sur appeal makes no allegation that it is "aggrieved" as a result of the order, citing Pennsylvania Commercial Drivers v. Milk Control Commission, 360 Pa. 477 (1948), holding that a person on appeal must have an interest in the subject matter which is direct, immediate, substantial and pecuniary and not a remote consequence. While this is indeed a correct statement of the law, we find that, contrary to the commission's contention, Milk Maid has specifically stated in para-

---

1. Emphasis throughout ours unless otherwise noted.

graph 10 of its petition sur appeal that it is "aggrieved" both generally and specifically, enumerating section E, provisions 3, 5 and 7, and the schedules of minimum prices. Even without this allegation it is apparent that the order does regulate the prices at which Milk Maid buys and sells its milk, thereby regulating its gross profits. Moreover, petitioner falls, by definition, into the category of licensed milk dealers which will be and/or are regulated by subsections (a), (1, (2), (3) and (4) of provision 7 of section E of the general order. We conclude that Milk Maid is a proper party to this appeal.

## II.

*Does the Failure of the Commission to Place the Labor Contracts in Evidence at the Hearing Constitute a Lack of Due Process of Law?*

Appellant vigorously contends that it was not afforded the right of cross examination in regard to the labor contracts which Mr. Harbison, an expert witness called on behalf of the Milk Distributors' Association of the Philadelphia Area, Inc., testified he considered in preparing his analysis of the dealers' "cost increases" in the Philadelphia area following the new labor contracts of 1962, 1963 and 1964. This analysis appears in Milk Dealers' exhibit no. 1, table no. 1, at pages 1 and 2.

The commission contends that Harbison's "analysis" reflected the labor contracts and that such evidence is a sufficient basis for its findings of fact thereon. It also argues that the appellant did not at the time of the hearing avail itself of the opportunity to cross examine Mr. Harbison as to the contents and effect of these labor contracts, nor did appellant take the opportunity to place in the record any evidence of its own labor contract or the effect thereof on its cost of doing business.

It is interesting to note that originally counsel for

all the parties represented at the hearing, except counsel for the Sylvan Seal Milk, Inc., seemed to agree that these labor contracts should be placed in the record. The question in issue here arose when counsel for the Milk Distributors' Association, Inc. questioned the witness Harbison in regard to the difference existing between the labor contracts of Sylvan Seal and those "of most of the other members of the industry." Objection to the question, in the absence of the labor contracts, was made not only by appellant's former counsel, Mr. Woolston, but also by Mr. Daniels, counsel for Suburban Milk Dealers' Association, as follows:

"MR. DANIELS: My objection is that the contracts would speak for themselves. Put them in the record and the Commission can analyze them. It seems to me that a copy of the contracts should be placed in the record and then the Commission can analyze them.

"MR. LOWENTHAL (Counsel for Sylvan Seal): The contracts can be on file with the Commission and they can analyze them more expertly than the witness can because they will have more time.

"MR. DANIELS: I don't know how they can be analyzed until they are made a part of the record as an exhibit. The Commission can put them in the record.

"MR. MORRIS: I may suggest, Mr. Chairman, that the Commission take official notice of the contracts filed with the Commission for Sylvan Seal and other industry members, such as those contracts that may be—

"MR. DANIELS: Mr. Morris, I might object to official notice being taken if you don't put them in the record. If they are in the record then I will agree that official notice be taken. They should be offered as an exhibit. If I had them I would offer them myself.

"MR. LOWENTHAL: I would say at this point that the information is as confidential as the financial information that our company submits to the Commission.

"MR. DANIELS: I don't think it is confidential when you are using your cost as a recommendation for a drastic change in the quantity discount.

"I think it is very important that the Commission has the labor contract. If you will pardon me, this is the first hearing that I have ever been at representing the dealers that we have not offered the labor contract. I think that is a very pertinent part of the hearing. . . .

"I don't think there is anything more important in this hearing. Mr. Harbison has talked about increased labor costs and has tabulated it. I don't think there could be anything more material or relevant than the labor contracts, which the entire City of Philadelphia knows, the newspapers also. . . ."

"MR. MORGAN (Chief Counsel to the Commission): It is the Commission's position that the labor contracts are the best evidence of the increased cost. We will object to the exhibit without the best evidence being in. . . .

"In other words, you have an analysis of increased costs under Table 1, page 1 and the best analysis of increases are on the labor contract itself.

"I feel that the Commission should have an opportunity to examine the labor contract and suggest that the parties at the hearing agree that the labor contract be submitted to the Commission and then they be allowed to take that into consideration in the Commission's determination."

All counsel at the hearing, except counsel for appellant, finally stipulated, in response to a suggestion of the chairman of the commission, that all of the dealers "submit to the Commission, within a reasonable period to be fixed by the Chairman, the labor contracts, that these labor contracts are to be considered by the Commission in their deliberation and determination for an order in this area."

Appellant's counsel, however, voiced his objection as follows:

"MR. WOOLSTON: That wouldn't permit any cross-examination, should I desire to cross-examine. . . .

"If the contracts are submitted after the termination of the hearing and not subject to cross-examination of the labor contract, there will be no opportunity to cross-examine and therefore I object to the introduction of evidence after the termination of the hearing."

After the chairman made an affirmative ruling incorporating the stipulation, the commission's chief counsel again stated his views:

"MR. MORGAN: Gentlemen, the reason I feel that the contracts should be made a part of the record is that we have had submitted here by the dealer association a composite of the effects of the contract upon their cost of production and I think the best evidence would be their contracts and I think we should have it for their benefit."

Appellant cites the landmark case of Colteryahn Sanitary Dairy v. Milk Control Commission, 332 Pa. 15, 21 (1938), wherein the Supreme Court, speaking through Mr. Chief Justice Kephart, said:

". . . The production of proof before this administrative body is not subject to the strict rules of evidence, and the Commission may make its independent survey of the milk industry in the particular area to acquire a just and fair understanding of the problems before it. But the result of that survey should be placed on the record of the hearing before the Commission, and the parties who make the survey should be subject to such cross-examination as is proper. Interested parties should be accorded opportunity to test the reliability of the Commission's evidence before an order is promulgated, revised or changed.

"It was also the legislative intent that the hearings before the Commission in relation to price-fixing should be complete. By this it is meant that all 'essential facts in the first instance' should be submitted 'to the Commission at its hearing' either by the dealers or the producers in any application for change of price or contest over price (Section 906). It was not the intention of the legislature that dealers or producers should withhold evidence at such hearing, and then, on appeal, submit that evidence to the Dauphin County court, thus presenting an entirely new case, and forcing the court to exercise legislative powers. With this purpose in view, milk dealers and producers may be compelled to submit all books and accounts to the Commission, as evidence, for the purpose of determining whether a profit or loss has been made on all prices of milk in the several classes. The Commission and the persons interested should have free access to this evidence, with the right to conduct an examination or cross-examination, if the Commission is to properly function."

Appellant argues that the hearing in the instant case violated the rules of procedure laid down in Colteryahn and that when the chairman directed the dealers to submit contracts to the commission 10 days after the close of the hearing, the hearing became at that time a proceeding at which "essential facts in the first instance" were not submitted "to the Commission at its hearing."

Appellant also relies on Gottshall v. Batt, 18 D. & C. 2d 137 (1958), in which this court, speaking through the late President Judge Neely, noted the procedure which should govern hearings held by quasi judicial bodies and quoted extensively from Morgan v. United States, 298 U. S. 468 (1936), wherein that court remanded the case for further proceedings on the basis of the invalidity that inhered in the procedure before the Secretary of Agriculture. In that case the Su-

preme Court of the United States said in connection with fundamental procedural requirements that

". . . There must be evidence adequate to support pertinent and necessary findings of fact. Nothing can be treated as evidence which is not introduced as such. United States v. Abilene & Southern Ry. Co., supra. Facts and circumstances which ought to be considered must not be excluded. Facts and circumstances must not be considered which should not legally influence the conclusion. Findings based on the evidence must embrace the basic facts which are needed to sustain the order. . . ." (p. 480)

In the Gottshall case, Judge Neely also quoted from State Board of Private Business Schools v. Thomasson, 66 Dauph. 110, 128 (1954), where this court, speaking through Judge Sohn, held that *Unfair restriction of the right of cross-examination is a denial of due process.*

The record indicates that the chairman originally was under the impression that the labor contracts in question were confidential in nature and therefore should not be placed in the record. Subsequently, however, he receded from his position and declared that they were partially confidential. However, the labor contracts were not offered in evidence at the hearing, the chairman ruling that they should be placed in the record for subsequent consideration.[2]

Appellant contends that there is no way of knowing which labor contracts were submitted after the hear-

---

2. "THE CHAIRMAN: Mr. Woolston, you were here a while ago when you heard said that in ten days all various labor contract copies should be mailed to the Commission.

"You heard me further say that we will take these under consideration and you can be assured that if we find that there is something wrong with the order we write and if it takes two years we will come back and tell you boys that we find things differently than we found at the time the order was written. I think you can rest assured of that."

ing had closed, or how many were submitted or whether the contracts for wholesale dealers differed from contracts for retail dealers or any other relevant matter which could have been ascertained by cross examination at the hearing.

We are of the opinion that in light of the authorities cited, the commission's failure to place the labor contracts in evidence at the hearing deprived the appellant of its right to test adequately by cross examination the validity of the "analysis" of the dealers' alleged "cost increases" and that consequently this case should be remanded to the commission for further proceedings. Moreover, we think the commission should set forth in appropriate findings of fact the evidence used by it to justify the increase in the price of cream. This court cannot accept in lieu thereof the computation marked exhibit "C" which the commission attached to its brief.

### Order

And now, October 30, 1964, the record in this case is remanded to the Pennsylvania Milk Control Commission for further proceedings in conformity with this opinion. The commission is directed to schedule promptly another hearing at which the labor contracts shall be placed in evidence and made available for cross examination of the witnesses who had previously testified and others who may do so. The Commission's Official General Order No. A-632 shall remain in effect pending its final disposition. Jurisdiction of this case is retained by the court.