Colteryahn Sanitary Dairy *v.* Milk Control Commission of Pennsylvania, Appellant.

Keystone Dairy Company *v.* Milk Control Commission of Pennsylvania, Appellant.

Argued June 17, 1938. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

18

*Harry Polikoff,* Deputy Attorney General, with him *Guy K. Bard,* Attorney General, and *Charles J. Ware,* Assistant Deputy Attorney General, for appellant.

*Willis F. Daniels,* with him *Charles K. Robinson, Harry Dunmire, Hamilton A. Robinson, Harry Birmingham* and *Rose Daniels,* for appellee.

*E. Lowry Humes,* for interested parties, under Rule 61.

OPINION BY MR. CHIEF JUSTICE KEPHART, June 30, 1938: These two appeals are from the action of the Court of Common Pleas of Dauphin County on appeals from the orders of the Milk Control Commission. The Commission had fixed a price of $3.25 per hundredweight to be paid to producers in the Pittsburgh area for class 1 fluid milk. This order was effective, and unattacked, from December 21, 1936, until July, 1937. At that time the Greater Pittsburgh Milk Dealers' Association filed a petition with the Commission for revision, contending that a new labor agreement and other new expenses had caused higher operating costs. At the hearing in August two dealers testified. It was contended that they were not representative dealers whose costs would reflect a general condition throughout this milk area, and that, as there was a discrepancy of one cent a quart in their estimates, their figures were totally unreliable. Furthermore, their evidence related only to grade "B" milk, which is the second grade of fluid milk. No testimony was produced as to the investments of these deal-

ers, but only as to sales. In September, 1937, the Commission promulgated Order A-18, fixing $3.19 as the minimum price. While the Commission rejected the evidence before it as insufficient, it made an independent investigation or survey upon which it based the order. This was not made part of the record. The dealers, although given an opportunity to present more facts, did not take advantage of it, nor did any interested person apply in writing for a revision, which could have been done under section 801 of the Milk Control Act of April 28, 1937, P. L. 417.[1] From the order fixing a price of $3.19, thirty dealers appealed, in October, 1937, to the Dauphin County court asking for a price to producers which would permit a six per cent return to dealers on their sales. Pending the hearing, the court below granted a supersedeas, and later fixed a minimum price of $3.06. While Order A-18 was before the Dauphin County court, the Commission, on its own motion, called another hearing in that area for December, 1937. At that time four dealers testified. As there are 232 dealers in the area, it was contended that their testimony was also insufficient to show what would be a fair price to the producer. However, on February 22, 1938, the Commission promulgated Order A-22, reducing the price to $3.15. This order was appealed by 48 dealers, and the court below fixed $3.03⅓ as the minimum producer's price. The Milk Control Commission has appealed to this Court from both decisions. The appeals of the dealers were consolidated in the court below. This is proper procedure; indeed, instead of having so many

---

[1] Section 801 provides: "That upon application in writing from a person aggrieved by an order of the commission hereunder, filed within fifteen (15) days after the issuance of the order complained of, or upon its own motion, the commission may, within twenty (20) days after the effective date of such order, issue an order revising or amending such order without a further hearing, if such revision or amendment is based on the record of the hearing held prior to the issuance of such order."

separate appeals from the same order lodged in the Dauphin County court, it may, upon petition order all proposed appeals to be lodged as one appeal, or the Procedural Rules Committee may prescribe general rules to cover cases of this character.

A number of questions have been raised for the consideration of this Court which will be discussed as presented. We held that the former Milk Control Law (Act of January 2, 1934, P. L. 174) regulating the milk industry by requiring dealers to be licensed and to give bonds with the power in the Board to fix minimum and maximum prices, was a valid exercise of the police power: *Rohrer v. Milk Control Board,* 322 Pa. 257. The present Act, so far as constitutional questions are concerned, is well within our prior decision, and we need not concern ourselves with that question at this time.

Considering the duties of the Milk Control Commission with respect to the conduct of hearings, section 801 of the Act requires "a hearing in which all interested parties shall be given reasonable opportunity to be heard" before orders shall be made fixing prices, relating to milk areas, and affecting other matters concerning the industry. It also provides that the scope of the hearing must be such as to enable the determination of such rates, areas, et cetera, as will be most beneficial to the public interest, best protect the milk industry, and secure a sufficient quantity of pure and wholesome milk for consumption, having special regard to the health and welfare of children. The Commission is required to base all prices upon all conditions affecting the milk industry in each milk marketing area, including in its consideration the amount necessary to yield a reasonable return to the producer and to the dealer. A general statement of findings of fact in support of, and the reasons for, each order is required to be filed with the order. The same procedure is required for changing or revising an order fixing prices as that in promulgating it. It is the general intent and purpose of the Act

that in the promulgation, revision or change of official orders fixing prices, a definite record should be made of all evidence produced before the Commission, and all matters upon which it bases its order. The production of proof before this administrative body is not subject to the strict rules of evidence, and the Commission may make its independent survey of the milk industry in the particular area to acquire a just and fair understanding of the problems before it. But the result of that survey should be placed on the record of the hearing before the Commission, and the parties who made the survey should be subject to such cross-examination as is proper. Interested parties should be accorded opportunity to test the reliability of the Commission's evidence before an order is promulgated, revised or changed.

It was also the legislative intent that the hearings before the Commission in relation to price-fixing should be complete. By this it is meant that all "essential facts in the first instance" should be submitted "to the Commission at its hearing" either by the dealers or the producers in any application for change of price or contest over price (Section 906). It was not the intention of the legislature that dealers or producers should withhold evidence at such hearing, and then, on appeal, submit that evidence to the Dauphin County court, thus presenting an entirely new case, and forcing the court to exercise legislative powers. With this purpose in view, milk dealers and producers may be compelled to submit all books and accounts to the Commission, as evidence, for the purpose of determining whether a profit or loss has been made on all prices of milk in the several classes. The Commission and the persons interested should have free access to this evidence, with the right to conduct an examination or cross-examination, if the Commission is to properly function.

The procedure in both of these appeals was erroneous in that the dealers did not submit to the Commission

all the evidence that was available, so that it could properly form its judgment as to what the price of milk should be to the producer. The responsibility for such decisions must first rest on the legislative agency, exercising legislative power. On appeal to the Dauphin County court to set aside an order, if evidence is there brought forward that could, and should, have been produced before the Commission, that court should promptly return the case to that body directing that all the available evidence be heard and considered, or, in its discretion, the court may simply decline to receive the evidence.

The legislature did give the Dauphin County court the right to hear evidence on appeal. The character of evidence that can be produced in that court, under these circumstances, might be evidence that was not available to present to the Commission, such as evidence to clarify the record, or to show the actual effect of the order appealed from on the producer or dealer. This could only be procured after promulgation of the order appealed from. If the court below follows this evident legislative purpose, it will have its labors much reduced. But, if the course of procedure adopted in these two appeals is followed, the Commission's usefulness will be at an end, and the Dauphin County court will become the price-fixing body for the milk industry.

When the evidence taken before the Commission is submitted to the court on appeal, and such additional testimony is taken as herein indicated, the duty of the court is to consider all of the evidence placed before it, and if, in its judgment, the Commission has capriciously refused to consider items that should have been entertained, or has considered items which should not have been entertained, the court can so state, or if the Commission has not given that weight to the evidence which due process requires, the court should return the case to the Commission. But this should be done with careful review of the record, pointing out wherein the Com-

mission has erred, or where additional findings of fact would warrant a change in the rate. These appeals, under section 906,[2] should have been resubmitted by the court below to the Commission with directions to reform the finding or order, or to revoke the order as the case required. As these are the first of such cases to be brought to our attention, we will remand the records as here on file to the Dauphin County court with direction to send them to the Commission for its consideration and action, from which further appeals may be taken if desired. Meanwhile, the Commission's rate in effect under order A-22 will continue as the effective rate until changed.

The form of the petition for appeal to the court below in these cases has also been called to our attention. The law requires that the petitioner shall state facts in support of his objections sufficient to constitute a prima facie case.[3] Since this was not done in the present cases, the omission would be fatal to the proceedings. It is well settled under the Act of March 21, 1806, P. L. 558, section 13, that where statutory remedies are provided, the procedure prescribed by the statute must be

---

[2] "If the court shall determine that the order is unreasonable or illegal it shall remit the case to the Commission with directions to reform the findings or order, or to revoke the order, in accordance with the court's opinion."

[3] Section 904 provides: "The appeal provided by this article from action of the commission shall be by petition against the commission, officially as defendant, alleging therein in brief detail the action and decision complained of, and praying for a reversal thereof. Such petition shall specify the petitioner's objections to the action and decision of the commission, and shall state facts in support of such objections sufficient to constitute a prima facie case; and any objection not so specified and supported by facts shall not be considered by the court. Every such petition reciting facts shall be supported by oath or affirmation; and the petition shall include as part thereof, under oath or affirmation, an averment that the appeal is not filed merely for purposes of delay.

strictly pursued, to the exclusion of other methods of redress: *Bowman v. Gum, Inc.*, 321 Pa. 516; *Commonwealth ex rel. v. Margiotti*, 325 Pa. 17, 32. This is particularly true of special statutory appeals from the action of administrative bodies: *White et al. v. Old York Road Club et al.*, 318 Pa. 346; *Taylor v. Moore*, 303 Pa. 469; *Ermine v. Frankel et al.*, 322 Pa. 70. While a person aggrieved by an order may request the Commission to revise its findings[4] this is not a necessary preliminary to appeal. The Act does not so command, and such procedure is permissive only. The failure of these parties to so proceed was not error.

The court below granted a supersedeas upon the suggestion of the attorney representing the dealers, fixing a price of $2.92 to be paid the producers, and ordering bonds to be filed covering the difference between that figure and the price of $3.19 fixed by the Commission in Order A-18. This was done merely upon averment by the dealers that $2.92 was a reasonable price. The court below is without authority to order a supersedeas under these facts. Sections 901 and 902 declare that no appeal shall be permitted to act as a supersedeas except on special order. The special order required by Section 903 is one which will preserve the status quo pending the adjudication of the appeal.[5] The price complained of on the original petition of the dealers to the Commission was $3.25. It was reduced by the Commission to $3.19. Nowhere in this Act is the court authorized of its own volition to set up a price lower than that existing under a previous valid order of the Commission on which to condition a supersedeas bond. The bond

---

[4] See the provision of Section 801, quoted in footnote 1, supra.

[5] "Section 903. Supersedeas.—A special order of court permitting an appeal to act as a supersedeas may be made only after reasonable notice to the commission, and shall provide that the appellant file a bond with sufficient sureties, in such sum as shall be determined by the court to be necessary for the protection of producers and others during the pendency of the appeal."

which is given by each dealer pursuant to the supersedeas[6] runs only to the producers who sell to him. It does not inure to the benefit of all of the producers in the given milk area. Therefore, where a supersedeas is properly granted, and a dealer does not see fit to file a bond, he will be required to pay the price fixed by the Commission until he does file a bond, or until the matter is adjudicated. When a bond is filed the producer selling to that dealer comes under the provisions of the Act relating to such bonds.

The question has arisen as to the status of those dealers who do not care to file a bond, and who pay the Commission's price, in case the court below determines the order unreasonable, and the Commission is required to fix a lower price. There is no provision in the Act, as there is in the Public Utility Law,[7] for a refunding order, but it may be that the Commission, within its implied powers, could relieve such dealers from loss of unlawful amounts paid, by adjusting future sales to them by the producers. Of course such dealers could sue for recoupment.

The court below denied the producers, through the Dairymen's Coöperative Association, the right to intervene. We do not understand the basis of the court's action. These associations are expressly recognized in the Act as agencies which may market producers' milk to dealers and others.[8] Such organizations represent large numbers of producers. The producer is vitally interested in the price to be fixed, as it intimately and directly affects him. In fact, the price to be paid the producer is here the sole matter of inquiry. The producers, where the Commission's order is acceptable to them, but is appealed from by the dealers, are not required to appeal to place themselves on record. The

---

[6] See Section 903 in footnote 5.

[7] Act of May 28, 1937, P. L. 1053, section 313.

[8] See Section 512.

Commission is made the defendant, and, as in public utility cases, the producer should be permitted to intervene and defend the Commission's order. The court below should have granted leave to the producers individually, or through the association recognized by the Act as their representative, to intervene.

It is urged that the question of the reasonableness of Order A-18 we are now considering is moot, because the Commission subsequently complied with the order of the court below and fixed the price at $3.06 for the area. But the Commission appealed that order, as it had the right to do. The question is not moot simply because the Commission chose to obey the court's decree, reserving to itself the right to change its order if the decision in this Court was against appellees. The record before us shows due notice was given of the intention to appeal.

The court below was considerably troubled, as we are, with the determination of the question of "whether or not the order is reasonable and in conformity with law." Appellant, the Milk Control Commission, argues that unless a maximum retail price is fixed the question of confiscation cannot arise, and confiscation does enter into the question of reasonableness. This may be so in theory, but in practice it may well be otherwise. When considering minimum consumer price it should be recognized that, in practice, competitive conditions may render it actually the maximum price, and if it so appears, the Commission and the court below may so regard it in resolving the question of price-fixing. In such case it does not do to say that the dealer *may* sell to the public at a higher price than the minimum. The answer is that the prevailing price in the area from all sources of competition is the maximum, and if the dealer cannot compete at that price, although reasonably efficient, his business will soon pass away. The interest of the public requires that the milk industry of the State be protected from oppressive and unreasonable regula-

tion through price-fixing whether the price fixed be denominated maximum or minimum.

Section 801, relating to price-fixing, provides: "The commission shall base all prices upon all conditions affecting the milk industry in each milk marketing area, including the amount necessary to yield a reasonable return to the producer and to the milk dealer." Section 802 relates to minimum or maximum wholesale and retail prices. Section 803 relates to prices to producers, providing only that a minimum price may be authorized. The Act does not set up any standard by which these prices may be fixed, but it lays down certain factual considerations that must be taken into account at the hearing. Any price must consider all the factors which, of necessity, enter into the conduct of the milk industry. The problem before the Commission in price-fixing, is to provide a fair return to producer and dealer, and to maintain a just consumers' price. It must consider as well the question of supply and demand and other economic factors entering into the problem. The producer, as well as the dealer, should receive a price that will not only compensate him for reasonable operating expenses, but permit a fair return on his investment. This may be difficult to ascertain, but it is the Commission's duty, in the first instance, to work it out. In so doing, the Commission should not select the most efficient or the least efficient producers or dealers in the milk districts, or areas, under consideration, upon whose figures of investments and costs to conclude what a fair return should be, but it should endeavor to utilize a cross-section representative of the average of the normally efficient producers or dealers in the district. Pursuant to Section 804,[9] the legislature has granted authority to

---

[9] "Orders of the commission fixing minimum or maximum prices may vary in different markets, and shall designate the markets to which applicable. Such orders may likewise classify milk and milk dealers in any reasonable manner which the commission deems advisable, and may vary according to the classes to which they are

the Commission to classify milk. Sale by the producers on the utilization plan has been the custom in numerous areas for a period of many years before the present laws were adopted. The producer delivers the whole milk to the dealer and is paid on the basis of its actual utilization in the various classifications. While the dealer keeps a record of the utilization of the milk, the producer never knows what he is going to receive for the milk he delivers from day to day. The dealer, therefore, by the use to which the product is put, determines the actual payment to the producer for each hundredweight, or the blended price of each hundredweight. In reaching prices to be paid producers it is not proper to segregate the different grades or classes of milk and have each stand on its own base. All classes should be considered in arriving at a reasonable minimum price to be paid. The return per hundred pounds paid to the producer including all classes, would depend entirely on the percentage of the hundred pounds used in class 1, as fluid milk, and the percentage sold in other classes. The blended price, or net result to the farmer for his milk will not be $3.19, $3.06, or $3.03⅓, per hundredweight, but a much lower figure, approximately $2.50. It was stated at argument, and appears from the record, that class 1 milk represented about 55 to 60 per cent of the hundred pounds.

To compute a fair return on class 1 milk by segregation, a divisible part of the entire investment and operating cost would have to be allocated to class 1, and

applicable. The orders of the commission with respect to the minimum prices to be paid to producers and others shall apply to the area in which the milk is produced, or to the area in which the milk so produced is sold, and may vary in different areas according to varying uses, grades and conditions. Each such order may classify such milk by forms, classes, grade or uses, as the commission may deem advisable, and may specify the minimum prices therefor. Other reasonable methods of classification may be prescribed by the commission."

the price or fair return for that class rated accordingly. The price of class 1 and 1-A milk can be fixed in Pennsylvania without serious threat of competition from other States because of its highly perishable nature and the costs of transportation. This is not true of the other classes, which may be regarded as by-products or surplus milk. But if these classes of milk, because of competition from other states, were to be considered worthless, it may be plainly seen that our milk industry would suffer very seriously unless the price of fluid milk to the consumer and producer, in class 1, were raised much higher. The lower classes become worthless when the price for them is fixed so high that they cannot be sold on the market either because of competition from Western States or for any other cause. These prices, according to appellees' argument, would be fixed by the Commission through segregation, much above the competitive or market price.[10] But if this surplus milk can meet this competition and is able to be sold or dealt in by Pennsylvania dealers, it increases by so much the total return on the milk. If this additional return is considered in computing fair return, necessarily the price of class 1 must feel the effect and be reduced from what it would be if the lower classes were of no value. The effect of considering all classes is that the return on lower classes at or near competitive prices makes it possible to lower the price of the fluid milk. That these lower classes meet with serious competition from outside because of their less perishable nature, important though this may be in the Commission's stabilization of

---

[10] If the blended price to the producer is $2.52 per hundred pounds from all classes, and he receives 60% of the hundred pounds of class 1 return of $1.89, based on a price of $3.15 per hundred pounds of class 1 milk, manifestly *if the other part of the milk was worthless* the price to the producer on class 1, to enable him to obtain $2.52 on the hundredweight, would be at a much higher ratio. To pay the $2.52 if there was no return on the other classes, the price of class 1 would have to be $4.20 (60% of $4.20 is $2.52).

prices, is no reason for segregating these classes in price-fixing, thereby compelling a "fair return" on each class through the allocation of cost and return on investment, and requiring the lower classes to produce retail prices the market will not stand because of this competition with the markets of other states. Moreover it places a great burden on the Commission, and all concerned, to endeavor to assemble the particular portions of the investment and cost that might be allocated to the different classes. The producer does not do it. It appears that the dealers do not maintain a division of accounts for this purpose. The segregation theory cannot be justified as urged by appellees, by likening the dealer in several classes to a utility which sells both gas and electricity, and is permitted a fair return on each division of its service independent of the other. The milk producer sells but one basic product. The different classes are the normal return from the whole milk that the cow produces and the producer sells.

The theory that segregation of the classes is essential in determining fair return, no doubt led the court below to adopt the sales dollar return as a convenient basis for price fixing. We do not hold this theory incorrect applied to the total business of the dealer although it is a new standard and may produce a return of a very large per cent on fair value. It may be that "fair return" should be based upon the same rules governing the return of a public utility or upon a combination of these two theories, or some other standard may be adopted. We do not attempt to lay down any theory of fair return. It is the duty of the Commission to devise such a theory as will conform to the law, basing its conclusion on sufficient evidence. That evidence is not present in these records. But, as we have indicated above, no price-fixing theory would be complete which did not consider both the producer's and dealer's positions in relation thereto. The Act so provides.

When considering the price which must be paid to the producer the spread between it and the consumer price must also be considered. If the dealers are to survive they must receive a profit over and above the costs of operation and the hazard of the business. Confiscation to the dealer, which is to be here considered, does not appear merely because the dealer is required to pay the producer a certain minimum price. It appears only when the retail price received, deducting the sum paid to the producers, leaves the dealer without a fair return.

The factors entering into fair return as they relate to a particular milk area are many and varied. Prices in other areas should not be taken as a guide unless it appears from the record that there is a fair comparison under similar situations and conditions. The facts presented to or obtained by the Commission, must be such that it can determine with reasonable certainty what is a fair return to producer and dealer, so that confiscation or unfairness may not appear in either case, and a price should be fixed for the producer that reflects that conclusion, with due regard for the effect of the order on the consuming public.

Milk regulation is a new venture in our State. It has been held constitutional. It is the duty of the courts to aid it as far as possible in the interest of health and sanitation.[11] In assisting in this vitally important pro-

---

[11] The preamble of the Act of 1937 states:

"1. Milk is the most necessary human food, vital for promotion of the public health and for development of strength and vigor in the race. It is a most fertile field for the growth of bacteria, and therefore its production and distribution have been surrounded by more costly sanitary requirements than those of any other commodity in this, the third greatest milk producing and consuming state of the nation.

"2. Milk consumers are not assured of a constant and sufficient supply of pure, wholesome milk unless the high cost of maintaining sanitary conditions of production and standards of purity is returned to the producers of milk. If this is not done,

gram, it must be borne in mind that courts are not price-fixing bodies. In appeals from the Commission, the courts consider the evidence produced before that body, and such other additional evidence as indicated, so as to determine whether or not confiscation appears, or, in other words, whether the order appealed from is reasonable. We do not determine, nor should we be called upon to do so, in the first instance, what elements are proper factors in price fixing. That is a legislative matter for the Commission to decide. Its conclusion should not be disturbed by us unless the inclusion or exclusion of material items is arbitrary or capricious, and the Dauphin County court may consider whether or not proper weight has been given to the items involved. So also it may determine whether the fair return is reasonably based on a standard that is found to be legal. In all appeals the burden of proof is on appellants.

In both cases the court below based its decision largely upon testimony of the dealers which had not been produced before the Commission in the first instance, although it was available for that purpose. This was reversible error. While the court stated that it was not "unmindful" of the rights of the producers in these appeals, they were not represented before the lower court in either case, and were denied the right to intervene in the Keystone case.

In arriving at its conclusion the trial court placed its chief reliance upon the testimony of five dealers which it accepted as representative of the 232 dealers in the area, rather than upon the survey of the Commission,

---

large numbers dispose of their herds or engage in milk strikes, and remaining producers supply unhealthful milk or milk of lower quality because of financial inability to comply with sanitary requirements and to keep vigilant against contamination. Public health is menaced when milk dealers do not or cannot pay a price to producers commensurate with the cost of sanitary production, or when consumers are required to pay excessive prices for this necessity of life."

which included 21 dealers, and was consequently more representative of the industry. Although the court did consider this survey, Exhibit A-3, it gave it an improper effect by refusing to consider anything other than the composite figures for the 21 dealers represented. No weight at all was given to the fact that one of these dealers, Meadow Gold, showed an extraordinary and unusual loss for the month considered, and thus pulled down the entire composite average. This factor could and should have been taken into consideration.

The Commission's reports or statements accompanying its orders discussed the different classifications of milk, and the prices for classes 1 and 1-A, with a certain price formula for other classes. It did not set forth sufficiently the basis upon which these prices were fixed, except possibly for the market prices of the lower grades. Nor do we find in the evidence data upon which producers' return could be legally predicated. We assume that the various prices were fixed on the basis that all grades were interdependent, and upon inadequate information before the Commission as to the dealers' position. Without the assistance of the dealers in helping to solve this problem the Commission was no doubt embarrassed. We have read with interest its report on this feature, and it must be understood in the future that neither dealers nor producers can withhold from the Commission any books, record or assistance which will aid it in reasonable price-fixing.

The record in both appeals is remanded to the Court of Common Pleas of Dauphin County, with direction to return it to the Commission for further hearing and consideration in conformity with this opinion; the minimum price to be paid to producers, meanwhile, to remain at the rate fixed by the Commission in Order A-22.