618 A.2d 1050

**Norbert BABAC and Anne Martin Criss, Petitioners,**

v.

**PENNSYLVANIA MILK MARKETING BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 16, 1992.

Decided Nov. 24, 1992.

Reconsideration Granted, Order Modified Jan. 28, 1993.

580

Thomas J. Finucane, for petitioners.

Randall N. Sears, Chief Counsel, for respondent.

Allen C. Warshaw, for intervenor Area 5 Milk Dealers.

Donn L. Snyder, for intervenor Pennsylvania Food Merchants Ass'n.

Before PALLADINO and McGINLEY, JJ., and BARRY, Senior Judge.

BARRY, Senior Judge.

Norbert Babac and Anne Martin Criss (Babac/Criss) appeal from an order of the Pennsylvania Milk Marketing Board (the Board) establishing minimum wholesale and retail prices for milk and certain milk products in the Western Milk Marketing Area 5, pursuant to the provisions of the Milk Marketing Law.[1]  Babac/Criss argue that the Board erred when setting the minimum wholesale price by using a delivery cost factor which represents only one category of dealers in the milk marketing industry.  Babac/Criss also argue that the order, which does not require retailers who purchase milk and milk products at a discount to pass the discount along to consumers, is discriminatory.  Babac/Criss further contend that the milk dealers who petitioned for a change in the milk pricing order were required to show a threshold need based upon a net return of sales which did not fall within the statutory range and that the Board must consider aggregate wholesale and retail milk sales before modifying an existing price order.[2]

1. Act of April 28, 1937, P.L. 417, *as amended*, 31 P.S. §§ 700j–101 through 700j–1204.

2. Babac/Criss's third and fourth argument were previously rejected by this Court. *Babac v. Commonwealth, Milk Marketing Board*, 136 Pa. Cmwlth.Ct. 621, 584 A.2d 399, *petition for allowance of appeal granted*, 528 Pa. 638, 598 A.2d 994 (1991), *appeal after remand*, 140 Pa.Cmwlth. Ct. 553, 593 A.2d 1337 (1991) (*Babac I*).

582

We find merit to Babac/Criss' initial argument, vacate the order and remand for further proceedings.

▮ Our standard of review in this case flows from the statute. The Board has a mandatory obligation to fix minimum wholesale and retail prices to be charged and received by milk dealers and handlers within milk marketing areas. Sections 802 and 803 of the Law, 31 P.S. §§ 700j–802, 700j–803. Thus, when examining an order of the Board setting minimum retail and wholesale prices for milk, we will examine the record to determine if substantial evidence supports necessary factual findings or whether an error of law has occurred. See Lily–Penn Food Stores, Inc. v. Pennsylvania Milk Marketing Board, 42 Pa.Cmwlth.Ct. 92, 400 A.2d 661 (1979), (Lily–Penn I, factual matters requiring interpretation of statistical data raise technical questions within Board's expertise and will not be disturbed if adequately supported by the record); Lily Penn Food Stores, Inc. v. Milk Marketing Board, 62 Pa. Cmwlth.Ct. 597, 437 A.2d 485 (1981), (Lily Penn II, order establishing minimum wholesale and retail prices for milk examined for error of law).[3]

---

3.  The Board urges that the order on appeal here can only be examined under an abuse of discretion standard, citing Lily Penn Food Stores, Inc. v. Pennsylvania Milk Marketing Board, 80 Pa.Cmwlth.Ct. 266, 472 A.2d 715 (1984) (Lily Penn III ). We disagree. At issue In Lily Penn III was an order setting minimum prices for lowfat and skim milk. Prices for whole milk were not affected by the order. The version of 31 P.S. § 700j–802 in effect at that time read in pertinent part as follows: "The fixing of minimum wholesale or retail prices for skimmed milk, condensed or concentrated whole or skimmed milk, bulk cream handled between milk dealers or handlers other than stores, and ice cream mix, shall be discretionary with the board." Act of April 28, 1937, P.L. 417, Art. VIII. § 802, as amended by, Act of of July 31, 1968, P.L. 963, § 41. Lily Penn III determined that lowfat milk was analogous to skimmed milk and, because the Commission was not required to set any minimum price for those products, any order setting such prices was an act totally committed to agency discretion and reviewable only for an abuse of discretion. The current version of the statute includes skimmed milk and lowfat milk in the definition of "milk". Section 103 of the Law, 31 P.S. § 700j–103. As currently drafted, 31 P.S. § 700j–802 states the the Board "shall fix ... minimum wholesale and retail prices ... for milk sold." 31 P.S. § 700j–803 is similarly phrased in the imperative. Unlike the case in Lily Penn III, the Board has a mandatory duty to set minimum prices for the products at issue here. Thus, we conclude that the substantial evidence/error of law standards employed in Lily–Penn I

■ The intent of the Milk Marketing Law is clear. The Board must consider the interest of "(1) the producers of milk, (2) the transporters, processors and sellers of dairy products, and (3) the consuming public." *City of Pittsburgh v. Milk Marketing Board*, 1 Pa.Cmwlth.Ct. 300, 307–08, 275 A.2d 115, 120 (1971). "The problem before the [Board] in price fixing, is to provide a fair return to producer and dealer, and to maintain a just consumers' price." *Colteryahn Sanitary Dairy v. Milk Control Commission of Pennsylvania*, 332 Pa. 15, 27, 1 A.2d 775, 781 (1938). The provisions of a price fixing order made by the Board are presumptively valid; anyone contending that an order is invalid bears the burden of proving that allegation. Section 801 of the Law, 31. P.S. § 700j–801. The Milk Marketing Law does not specify a precise formula which the Board must use to set minimum prices. The factors which must be considered, however, are specified:

> The board shall base all prices upon all conditions affecting the milk industry in each milk marketing area, . . . the board shall utilize available information concerning producers' cost of production and a cross-section representative of producers, dealers and stores in the area and shall consider unit costs of various types of products and various sizes of containers.

31 P.S. § 700j–801. Thus, any price set must take into account "all the factors which, of necessity, enter into the conduct of the milk industry." *Colteryahn Dairy*, 332 Pa. at 27, 1 A.2d at 781.

The facts relevant to this appeal are undisputed. In setting the pricing order at issue, the Board was presented the following evidence regarding delivery costs to various categories of wholesalers in the industry:

| | |
|---|---|
| Supermarkets (by tractor-trailer) | $.0412/point |
| Supermarkets (by straightbody truck) | $.0675/point |
| Convenience Stores | $.0771/point |
| Medium Size Wholesalers | $.0845/point |

& *Lily Penn II* apply, rather than the more lenient abuse of discretion standard of *Lily Penn III*.

| | |
|---|---|
| Schools | $.1363/point |
| Small Wholesalers | $.1372/point |
| Home Delivery | $.3769/point |

---

(Exhibit R2–D16). The delivery cost for each wholesaler category is a representative cross-section of that category. The Board employed the delivery cost for small wholesalers in setting the base minimum wholesale price. The order allows for discounts from that base minimum wholesale price for large deliveries which meet various specified conditions.

■ Babac/Criss argue that by employing only the cost of deliveries to small wholesalers, the Board has failed to follow the statutory mandate to utilize available information regarding a representative cross section of dealers in the market area. We agree. It is not disputed that the evidence relied upon presents cost data of a representative cross-section of each wholesaler category. To select from that list, however, the delivery cost for only one category and to employ that figure to set the minimum wholesale price for the entire market is to establish a price based upon data which does not represent the delivery cost of the entire industry. The method used to establish the base minimum price ignores the representative delivery costs of the other six categories and violates the statutory mandates to base all prices upon all conditions affecting the milk industry and utilize the available information.

Our decision today is supported by the analysis in our previous opinion in *Lily Penn II*. In setting the order at issue, the Board had employed data developed from four dealers as the representative cross-section of dealers. Only one of the dealers in that cross-section had any supermarket business and the percentage of supermarket business for that dealer was much smaller than that of conventional dealers. We held that the Board had erred as a matter of law because the cross-section it used was not representative of the industry. *Lily Penn II*, 62 Pa.Cmwlth.Ct. at 600–04, 437 A.2d at 488–89.

The procedure employed by the Board in the case at hand complies with the letter of *Lily Penn II* but does not comport with its underlying principle. Evidence was properly presented representing all categories of the wholesalers in the industry. By selecting a delivery cost which represents only one category, however, the Board does not utilize the available information concerning a representative cross-section of the entire industry when setting the base minimum wholesale price.[4] We reject the Board's contention that 31 P.S. § 700j–801 only requires it to consider all factors and that it has discretion to utilize selected portions of representative data once it has reviewed all the evidence presented.[5]

Intervenors, Area 5 Milk Dealers (the Dealers), argue that the information regarding the delivery costs for the other wholesaler categories, which is not utilized to set the base minimum wholesale price, is accounted for in the discount

4.  Our holding today is not contrary to our decision in *Babac v. Milk Marketing Board*, 140 Pa.Cmwlth.Ct. 553, 593 A.2d 1337 (1991) (*Babac II*). In *Babac II* we held that the Board need not consider evidence of actual milk sales income when issuing a price order because 31 P.S. § 700j–801, "by its terms is limited to setting minimum prices by projecting costs and adding a reasonable return factor...." *Babac II*, 140 Pa.Cmwlth.Ct. at 556–57, 593 A.2d at 1339. Unlike the data excluded in *Babac II*, that excluded here is required to be included in the 31 P.S. § 700j–801 price setting calculation. Its exclusion distorts the cost projection by basing that projection on a non-representative cross-section of delivery costs.

5.  The factual setting in *Finucane v. Pennsylvania Milk Marketing Board*, 135 Pa.Cmwlth.Ct. 606, 581 A.2d 1023 (1990), which upheld an order based upon consideration of all factors but use of limited data in establishing a bracket system pricing order must be distinguished from our holding today. In *Finucane*, the Board had heard testimony concerning both controlled and non-controlled sales but did not use the non-controlled sales data when calculating the rate of return. We noted that Section 700j–801 mandated that the rate of return be calculated "based on net sales of *price-controlled products.*" *Finucane*, 135 Pa.Cmwlth.Ct. at 616, 581 A.2d at 1028 (quoting 31 P.S. Section 700j–801, emphasis in opinion, not in statute). We held that it was proper for the Board to hear testimony regarding non-controlled milk products to meet its obligation to consider all conditions affecting the milk industry while using only the price controlled data to calculate rate of return. There is no evidence that the excluded delivery cost data at issue here related to non-controlled products. Thus, *Finucane* would not support the exclusion of this data from the calculations performed here.

system which the pricing order allows for large quantity deliveries. We are unable to determine from the Board's order and accompanying findings of facts and conclusions of law how the delivery cost data for the other categories has been utilized in calculating the availability and amount of discounts. Accordingly, this case is remanded to the Board for further proceedings to determine if and how the excluded delivery cost data is utilized in calculating those discounts and how those discounts of wholesale prices affect retail prices.[6] *City of Pittsburgh*, 1 Pa.Cmwlth.Ct. at 321–22, 275 A.2d at 126, (remand proper where record does not disclose justification or explanation of Board's calculation).

Vacated and remanded.

## ORDER

NOW, January 28, 1993, by mutual consent of all parties, reconsideration is granted and the order of November 24, 1992, is modified to read as follows:

This case is remanded to the Board for proceedings to determine if and how the data regarding delivery costs to the other six categories of wholesalers in the industry was utilized in calculating the availability and amount of discounts from the base minimum wholesale price and how those discounts were reflected in the minimum retail price. The order of the Pennsylvania Milk Marketing Board, dated February 20, 1992, entered at No. A–870, shall remain in effect for a period not longer than thirty days following

6. The Board must utilize the available information in setting both minimum wholesale and retail prices. The minimum retail price is partially based upon the minimum wholesale price. (Decision of the Board, 2/20/92, Finding of Fact 29.) To the extent that the excluded delivery cost data is adequately reflected in the discount mechanism, the Board will have complied with the statutory mandate to base prices upon all conditions and utilize available information on representative cross-sections in establishing the minimum wholesale prices. The Board's obligation to utilize the data does not end there however. Calculation of a reasonable rate of return applies to all prices. If the discount system is the mechanism by which the excluded data is utilized, that discount system must, in some way, be reflected in the retail price so that it, too, is based upon data which represents delivery costs in the entire industry.

remand of the record herein to the Milk Marketing Board. The Milk Marketing Board is accorded thirty days to comply with its obligations upon remand as described in the accompanying opinion, and enter an appropriate pricing order. Should the Milk Marketing Board fail to comply with this Court's order within thirty days following remand of the record, the order of the Pennsylvania Milk Marketing Board, dated February 20, 1992, entered at No. A–870, is vacated.

Jurisdiction relinquished.