**THE SCHOOL DISTRICT OF PHILA-DELPHIA and Consumers Education and Protective Association and Lance Haver, on behalf of himself and all others similarly situated, Petitioners,**

v.

**PENNSYLVANIA MILK MARKETING BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 12, 1996.

Decided Oct. 18, 1996.

Eric B. Schnurer, Philadelphia, for Petitioners.

Jackie B. Sparkman, Philadelphia, for Petitioner, School District of Philadelphia.

Sally A. Ulrich, Chief Counsel, for Respondent, Pennsylvania Milk Marketing Board.

Allen C. Warshaw, Harrisburg, for Intervenors, Pennsylvania Association of Milk Dealers, Rosenberger's Dairy, Inc., Clover Farms Dairy, and Wawa Dairy.

Gwendolyn T. Mosley, Senior Deputy Attorney General, for Intervenor, Commonwealth of Pennsylvania.

J. Jackson Eaton, III, Allentown, for Intervenor, Lehigh Valley Dairies, Inc.

Donald F. Copeland, Philadelphia, for Intervenor, Atlantic Dairy Cooperative.

Before COLINS, President Judge, and McGINLEY, SMITH, PELLEGRINI, FRIEDMAN, FLAHERTY and LEADBETTER, JJ.

LEADBETTER, Judge.

This is a petition for review of Official General Order No. A–890 issued by the Pennsylvania Milk Marketing Board, pursuant to Pennsylvania's Milk Marketing Law. The order fixed minimum wholesale prices for milk in Milk Market Area 1 including the prices charged to schools.[1] Petitioners, the School District of Philadelphia, Consumers Education and Protective Association, and Lance Haver[2] ask this Court to declare the Milk Marketing Law unconstitutional, to vacate the subject official general order, and to direct the Board to permit minimum wholesale prices for school milk to be fixed by

---

1. Milk Marketing Area 1 is all municipalities, cities, boroughs and townships located within the counties of Bucks, Chester, Delaware, Montgomery and Philadelphia.

2. The case caption suggests that Mr. Haver is the nominal plaintiff in a class action suit. However, a review of the docket in this action reveals that there have been no motions filed or other actions taken to make this a class action. More-over, Mr. Haver has set forth no basis upon which a class action could be authorized for or would apply to a proceeding before the Milk Marketing Board. See generally: *Property Owners, Residents, and/or Taxpayers of Pleasant Valley School District v. Pleasant Valley School District*, 100 Pa.Cmwlth. 513, 515 A.2d 85, 87 n. 3 (1986) (administrative code does not make provision for maintenance of a class action).

market forces. We affirm the order of the Board.

In Pennsylvania, the sale of milk is regulated and controlled by the Milk Marketing Law ("the Law"), Act of April 28, 1937, P.L. 417, *as amended*, 31 P.S. §§ 700j–101 to 700j–1302. The Law is implemented by the Milk Marketing Board (the Board), an independent administrative agency. 31 P.S. § 700j–201. Section 802 of the Law directs the Board to fix by official order the minimum prices for the wholesale and retail sale of milk. 31 P.S. § 700j–802. Section 801 of the Law requires the Board to base minimum prices "upon all conditions affecting the milk industry in each milk marketing area, including the amount necessary to yield a reasonable return ... on aggregate milk sales by milk dealers or handlers and stores selling milk." 31 P.S. § 700j–801. In ascertaining such returns, the Board considers the costs incurred by a cross-section of dealers representative of dealers in the area. *Id.* Milk dealers are allowed a rate of return of two and one-half (2 1/2%) percent to three and one-half (3 1/2%) percent "based on net sales of price-controlled products determined in accordance with generally accepted accounting principles." *Id.*

In December 1994, Lehigh Valley Dairies, Inc., applied to the Board for a price hearing to revise Official General Order A–863 (OGO A–863) and establish new minimum prices for the purchase and sale of milk in Area 1. The Board granted Lehigh's application and the hearing was held over several days in June of 1995.[3] The Board heard testimony from a representative of Lehigh, representatives of the School District of Philadelphia, and the Board's staff.

During the hearing, Area 1 was characterized as a competitive market in which milk dealers from both Pennsylvania and New Jersey compete. In recognition of the New Jersey influence, a nearby New Jersey milk dealer was included in the dealer cross-section considered. The School District of Philadelphia provided evidence that it purchases milk from a dealer who does business in both states and that dealer sells half-pints of milk to the similar urban schools in New Jersey for approximately four cents less than the school district is required to pay in Philadelphia. The School District also presented evidence that the price of milk charged to general consumers is higher in Pennsylvania than in neighboring states.

After the hearing, submission of briefs and a pre-order conference open to all interested parties, the Board issued Official General Order A–890 (OGO A–890) fixing minimum prices in Area 1, effective October 1, 1995. The order reduced half-pint prices for milk sold to schools by approximately one and one-third (1 1/3) cents.[4] The School District had sought a reduction of approximately five (5) cents.

■ Petitioners make the general complaint that OGO A–890 interferes with market forces and thus denies them the opportunity to purchase milk in Pennsylvania at a competitive price. They contend that enforcement of the Milk Marketing Law causes the School District of Philadelphia to spend an additional one million ($1,000,-000.00) dollars per year to purchase the milk it serves to students. The specific legal issues raised in this appeal are: (1) whether the enforcement of the Milk Marketing Law, particularly [31 P.S.] § 700j–801, violates the Commerce Clause of the United States Constitution;[5] (2) whether the procedures fol-

---

3. In support of its application, Lehigh had asserted that OGO A–863 was based on cost information for calendar year 1989, that processing costs had risen substantially in the interim, and that orders for all other milk marketing areas had been revised at least once since OGO A–863 went into effect.

4. Before the effective date of OGO A–890, Lehigh applied to the Board for a revision of the Area 1 order. On October 20, 1995, the Board issued OGO A–890 Amended, which became effective on December 1, 1995. The amended order provid-

ed for a recalculation of the price of milk for all container sizes by allowing an increase for small containers, but exempted from its scope half-pints sold to schools and spread the lost revenue over the other container sizes.

5. The Attorney General of Pennsylvania, who has intervened in this matter, asserts that the School District lacks the capacity to make this challenge on the ground that a school district has no rights under the federal constitution which it may assert in opposition to the will of the Commonwealth, its creator. *Penn–Delco School District*

lowed by the Board in adopting OGO A–890 violated petitioners' right to due process of law; and (3) whether the Board erred in its evaluation of evidence presented at the hearing.

Petitioners first contend that Section 700j–801 of the Law, which provides for the establishment of minimum prices, violates the Commerce Clause of the United States Constitution. A lawfully enacted statute carries a presumption of constitutionality. *In re Petition To Increase Millage Limit,* 166 Pa.Cmwlth. 161, 646 A.2d 61, 63 (1994). "Legislation will not be invalidated unless it clearly, palpably, and plainly violates the Constitution, and any doubts are to be resolved in favor of a finding of constitutionality." *Pennsylvania Liquor Control Board v. Spa Athletic Club,* 506 Pa. 364, 370, 485 A.2d 732, 735 (1984). After careful review of case law interpreting the Commerce Clause, we conclude that petitioners have failed to sustain the heavy burden of establishing unconstitutionality. *See In re Petition To Recall Reese,* 542 Pa. 114, 119, 665 A.2d 1162, 1164 (1995).

The Commerce Clause gives Congress the power to regulate commerce among the several states and with foreign nations. United States Constitution, Art. I, § 8, cl. 3. This affirmative grant of power to Congress "has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." *South–Central Timber Development, Inc. v. Wunnicke,* 467 U.S. 82, 87, 104 S.Ct. 2237, 2240, 81 L.Ed.2d 71, 76 (1984). Thus, the Commerce Clause has long been understood to prohibit the states from discriminating against or imposing an unjustifiable burden upon the interstate flow of articles of commerce. *Oregon Waste Systems, Inc. v. Department of Environmental Quality of the State of Oregon,* 511 U.S. 93, ——, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13, 20 (1994).

In determining whether a legislative enactment violates the Commerce Clause, a distinction must be made "between state statutes that burden interstate transactions only incidentally, and those that affirmatively discriminate against such transactions." *Maine v. Taylor,* 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110, 120 (1986). When a state statute directly favors in-state economic interests over out-of-state interests, it is discriminatory and the United States Supreme Court has generally struck it down. *Brown–Forman Distillers Corp. v. New York State Liquor Authority,* 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552, 559 (1986). In other words, "where simple economic protectionism is effected by state legislation, a virtually per se rule of invalidity has been erected." *Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475, 481 (1978). "Moreover, finding that state legislation constitutes 'economic protectionism' may be made on the basis of either discriminatory purpose ... or discriminatory effect." *Bacchus Imports v. Dias,* 468 U.S. 263, 270, 104 S.Ct. 3049, 3054, 82 L.Ed.2d 200, 206 (1984) (citations omitted).

On the other hand, it has been recognized "that incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people." *Philadelphia v. New Jersey,* 437 U.S. at 623–24, 98 S.Ct. at 2535, 57 L.Ed.2d at 481, and that "[e]very state police statute necessarily will affect interstate commerce in some degree, but such a statute does not run counter to the grant of Congressional power merely because it incidentally or indirectly involves or burdens interstate commerce." *Milk Control Board v. Eisenberg Farm Products,* 306 U.S. 346, 351, 59 S.Ct. 528, 530, 83 L.Ed. 752, 756 (1939). Thus, it has long been held that "[w]here the statute regulates even-handedly to effectuate a legitimate local public inter-

*v. Schukraft,* 95 Pa.Cmwlth. 619, 506 A.2d 956 (1986) *appeal denied* 514 Pa. 644, 523 A.2d 1133 (1987); *School District of Philadelphia v. Pennsylvania Milk Marketing Board,* 877 F.Supp. 245 (E.D.Pa.1995); *Northwestern School District v. Pittenger,* 397 F.Supp. 975 (W.D.Pa.1975).

While we agree that this is an accurate statement of the law, the remaining petitioners may raise the challenge, and have done so. Thus the School District's ability to assert this issue is of no consequence.

est, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174, 178 (1970). As the Supreme Court noted:

> The crucial inquiry, therefore, must be directed to determining whether [the statute] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental.

*Philadelphia v. New Jersey,* 437 U.S. at 624, 98 S.Ct. at 2536, 57 L.Ed.2d at 482.

■■■■ Petitioners claim that the price fixing provision of the Milk Marketing Law is protectionist because the Law precludes more efficient out-of-state milk dealers from selling milk in Pennsylvania at prices less than those charged by less efficient Pennsylvania milk dealers, thereby precluding out-of-state dealers from taking advantage of their natural competitive edge. Such a minimum pricing scheme, petitioners argue, amounts to economic protectionism of Pennsylvania's milk industry. This argument is meritless. Whatever advantage or burden the Law provides to an efficient dealer, those effects accrue equally to an efficient in-state and an efficient out-of-state dealer. Unquestionably, a wide range of efficiencies among dealers exists both in and out of state. However, "[t]he fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 126, 98 S.Ct. 2207, 2214, 57 L.Ed.2d 91, 100 (1978).

Petitioners attempt to support their case by claiming that Pennsylvania's higher prices resulting from application of the Law demonstrate the inefficiency of Pennsylvania's dealers. This argument is devoid of logical or evidentiary support. Since any "protectionism" in the Law aids (or burdens) similarly inefficient dealers from any state, the Law is geography-neutral. As noted by the United States Court of Appeals for the Third Circuit:

> Where the "burden" on out-of-state interests is no different from that placed on competing in-state interests, however, it is a burden on *commerce* rather than a burden on *interstate* commerce.

*Norfolk Southern Corp. v. Oberly,* 822 F.2d 388, 406 (3d Cir.1987).

Petitioners' reliance upon *West Lynn Creamery, Inc. v. Healy,* 512 U.S. 186, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994) is misplaced. In *West Lynn Creamery,* the United States Supreme Court struck down a federal milk pricing order[6] which imposed an assessment on milk sold by dealers to Massachusetts retailers. While the assessment itself was even handed, the entire assessment was *distributed* to Massachusetts dairy farmers. Because the order's avowed purpose and its undisputed effect were to subsidize *only* Massachusetts dairy farmers in order to allow them to compete with lower cost dairy farmers in other states, the Court held that the assessment represented the hallmark of economic protectionism prohibited by the Commerce Clause. *Id.* at ——, ——, 114 S.Ct. at 2212, 2217, 129 L.Ed.2d at 167–68, 174.

Conversely, as the United States District Court for the Middle District of Pennsylvania stated regarding Pennsylvania's Law, "[a]t most, the price controls do not burden but have only an incidental effect on interstate commerce which would not prevent Pennsylvania from pursuing its legitimate goals." *United Dairy Farmers Cooperative Ass'n v. Milk Control Commission,* 335 F.Supp. 1008, 1014 (M.D.Pa.1971), *aff'd,* 404 U.S. 930, 92 S.Ct. 280, 30 L.Ed.2d 244 (1971).

Having determined that Pennsylvania's statutory scheme places only an incidental burden on interstate commerce, we must next evaluate the local interests which the Law is designed to foster. We need not engage in extended discussion of this point,

---

**6.** The Agricultural Adjustment Act, 7 U.S.C. § 601, *et seq.* authorizes the Secretary of Agriculture to regulate the minimum prices paid to producers of raw milk by issuing marketing orders for particular geographic areas.

however, because the statutory purposes are clearly set out and have recently been reviewed by this Court.

Pennsylvania's Milk Marketing Law gives the Board authority to establish milk prices "as will be most beneficial to the public interest, best protect the milk industry of the Commonwealth and insure a sufficient quantity of pure and wholesome milk to inhabitants of the Commonwealth, having special regard to the health and welfare of children residing therein." 31 P.S. § 700j–801. The purpose of the Law "is to regulate the sale of milk and milk products so as to ensure that an adequate supply of milk exists and to establish a uniform economic condition for suppliers of milk." *Township of Muhlenberg v. Clover Farms Dairy Co.*, 665 A.2d 544, 548 (Pa.Cmwlth.1995), *appeal denied*, 544 Pa. 677, 678 A.2d 367 (1996). In upholding the legitimacy of that purpose, this Court has declared:

> The General Assembly, in providing for retail minimum price controls to provide stability in the retail milk market, believed a stable supply of milk is ensured when the retailer is assured an adequate return on the sale because the milk industry relies on retailers to distribute their product to the consumers. Since milk remains a vital commodity in Pennsylvania and the General Assembly finds that an adequate supply at a stable price is required for the benefit of the citizens, retail minimum price controls are a rational means to be employed by the General Assembly to achieve that objective.

*Finucane v. Pennsylvania Milk Marketing Board*, 136 Pa.Cmwlth. 272, 582 A.2d 1152, 1156 (1990). Because the Milk Marketing Law places only an incidental burden on interstate commerce, which burden is outweighed by important local benefits, the Law does not violate the Commerce Clause of the United States Constitution.

Petitioners next allege that they were denied due process of law during the proceedings associated with the issuance of OGO A–890. Petitioners claim that the Board favors the interests of milk dealers and, thus, it failed to remain impartial during the proceedings and issued an order which deprived the consuming public of a just price for milk. In fact, petitioners assert the Board and its staff are in collusion with the milk industry which it regulates.

There is no question that due process is required in all hearings before administrative agencies of the Commonwealth. *Brookwood Farms v. Milk Marketing Board*, 8 Pa.Cmwlth. 511, 304 A.2d 510, 514 (1973); *Sherman v. Kaiser*, 664 A.2d 221, 224 n. 1 (Pa.Cmwlth.1995). "Due process is a concept incapable of exact definition. Rather, it is a flexible notion which calls for such procedural safeguards as a particular situation demands to ensure fundamental fairness to a potentially aggrieved litigant." *Plowman v. Plowman*, 409 Pa. Superior Ct. 143, 151, 597 A.2d 701, 705 (1991). However, "a fair and impartial tribunal in the first instance is a cornerstone of our notion of due process." *Lyness v. State Board of Medicine*, 529 Pa. 535, 547 n. 12, 605 A.2d 1204, 1210 n. 12 (1992).

The delicate balance which faces the Milk Marketing Board in fixing prices is to provide a fair return to producers and dealers, while maintaining a just consumers' price. *Colteryahn Sanitary Dairy v. Milk Control Commission*, 332 Pa. 15, 27, 1 A.2d 775, 781 (1938). The Board must give equal consideration to the interests of milk producers, milk dealers, and the consuming public when fixing the price of milk. *Pittsburgh v. Milk Marketing Board*, 1 Pa.Cmwlth. 300, 275 A.2d 115, 119–20 (1971). Review of the record demonstrates that the Board fully complied with this charge and provided all interested parties with due process of law.

Carl Herbein, a certified public accountant retained by Lehigh to prepare an expert report on dealer costs, testified that he had not considered consumers' ability to pay when conducting his Area 1 cost study. The Board sustained an objection to follow-up questions on relevancy grounds. (R.117a–18a). Petitioners' assert this ruling demonstrates that the Board ignored its legal responsibility to milk consumers. Mr. Herbein was offered as an expert on dealer costs. His testimony pertained to processing and distribution costs incurred by Area 1

milk dealers. Consumers' ability to pay milk prices was entirely outside the scope of Mr. Herbein's direct testimony and, presumably, his expertise. While a factor to be considered by the Board, the law does not require milk dealers to establish consumers' ability to pay in making their case for the establishment of new minimum prices. 31 P.S. § 700j–801. There is nothing in the record to suggest that the Board failed to weigh this factor, nor that any particular evidence would have been necessary or helpful to the Board's consideration of the issue. Neither Mr. Haver nor the consumer organization made any effort to present such evidence. Thus, petitioners' first argument is meritless.

■ Petitioners' second argument also arises from the cross-examination of Mr. Herbein. The Board requires all milk dealers to file annual financial statements, which were used by Mr. Herbein in preparation of his cost study. During cross-examination, counsel for Cumberland Farms Agency, one of several interested parties to the proceeding, asked Mr. Herbein to produce the financial statements that he had used. An objection was raised and it was argued that the document request was made purely for purposes of delaying the hearing. (R.136a–39a). Petitioners contend that the Board's decision to sustain the objection shows that dealer financial statements were impermissibly kept confidential and made available only to the dealers and the Board. No such inference can reasonably be drawn. The statute specifically provides that such statements must be made available to the general public upon request. 31 P.S. § 700j–308.1. Yet prior to the commencement of the hearing, neither Cumberland Farms nor petitioners[7] had made any request to the Board or the dealers for such statements. Instead, an untimely request was made during cross examination of an expert witness and was denied because it would have delayed the hearing. Under such circumstances, there is no merit to petitioners' claim that the evidentiary ruling manifested bias on the part of the Board.

■ The remaining evidence of record to which petitioners point in support of their contention that the Board acted partially involves various actions taken by members of the Board's investigatory staff. The Board maintains an Enforcement and Accounting Division to enforce compliance with Milk Marketing laws and regulations and to gather and interpret financial and accounting information used by the Board in hearings. *The Pennsylvania Manual*, Vol. 112, p. 4–116 (1995). In a price-fixing hearing, the development and presentation of evidence is performed by members of the investigative staff. The Board itself hears the evidence presented and decides the case. Such dual roles are not at all uncommon in administrative agencies, and due process concerns are implicated only where an impermissible appearance of bias "arises from an *actual* environment of commingled functions." *Stone & Edwards Ins. Agency v. Department of Ins.*, 538 Pa. 276, 282, 648 A.2d 304, 307 (1994). There is no evidence here that the Board commingled its adjudicatory and investigatory functions. None of the acts complained of involved any Board members, but were generally unremarkable trial preparation cooperation between representatives of the Board's investigatory staff and the representatives of the dealers. Pre-hearing agreements regarding evidence is neither novel nor sinister. Petitioners were also free to contact Board staff to discuss the evidence prior to the hearing, and their failure to do so does not make other parties' pre-trial cooperation improper. Accordingly, we find no violation of petitioners' right to due process.

■ Finally, petitioners challenge two aspects of the Board's evaluation of evidence which they claim resulted in an unfairly high price. Specifically, petitioners claim that the Board's utilization of a sample cross-section which included high-cost, inefficient dealers runs contrary to a requirement that the Board utilize "a cross-section representative of the average of the *normally efficient* producers or dealers in the district." *Colteryahn Sanitary Dairy v. Milk Control Com.,*

---

**7.** Indeed petitioners have never made a request for these documents, and do not here challenge the evidentiary ruling itself.

332 Pa. at 27, 1 A.2d at 781. (Emphasis added). The Board argues that the *Colteryahn* standard is no longer viable and found that "[i]nclusion in the cross-section of both high-cost and low-cost dealers is appropriate." (Official General Order A–890, Sept. 22, 1995, Finding of Fact 5(e)).

In 1938, the average efficiency requirement was announced in *Colteryahn Sanitary Dairy.*[8] In 1941, the General Assembly codified the requirement by amending Section 801 to require the Board to ascertain a reasonable return to the milk dealers by utilizing, "a cross-section representative of the average or normally efficient ... dealers or handlers in the area." 31 P.S. § 700j–801 (1941) (subsequently amended). However, Section 801 was again amended and the "average or normally efficient" characterization of representativeness was deleted. In its present form, Section 801 requires that the Board "shall utilize ... a cross-section representative of producers, dealers and stores in the area and shall consider unit costs of various types of products and of various sizes of containers." 31 P.S. § 700j–801. *Babac v. Pennsylvania Milk Marketing Board,* 151 Pa.Cmwlth. 579, 618 A.2d 1050, 1052–53 (1992). Thus the Board did not err as a matter of law in the standard it utilized.[9]

Nor did it err when it found that the evidence presented satisfied this standard. In this case, the Board staff and the Area 1 milk dealers presented evidence showing the average costs of a cross-section of dealers in 1994 for various sizes of containers. The cross-section considered by the Board consisted of five dealers located within Area 1 and one dealer located in New Jersey who sells milk in Area 1. The evidence was that the six dealers comprising the cross-section were representative of dealers in the area based upon consideration of volume of sales in the area, the types of products and variety of container sizes sold, range of customers served, and the type and volume of deliveries made by the dealer. (R.447a–48a, 453a). After reviewing this evidence, the Board found the cross-section to be representative because: (1) the cross-section was geographically diverse; (2) the cross-section accounted for 62.2% of the total sales of Class I milk in Area 1 during 1994; (3) the dealers in the cross-section sell milk in various container sizes that are representative of the containers sold by dealers in Area 1; and (4) the dealers in the cross-section sell to customer types representative of Area 1, namely supermarkets, convenience stores, "mom and pop" stores, schools and institutions. (Official General Order A–890, Sept. 22, 1995, Finding of Fact 5). Because there was substantial evidence supporting the Board's finding, we will not disturb it on appeal. *Babac,* 618 A.2d at 1051.

Petitioners next argue that their evidence showed that the cumulative effect of a number of inflation factors resulted in overstating the price of milk by nearly five (5) cents. The petitioners allege that the Board's reliance upon total costs, including fixed costs, inflated the cost figures, and suggest that a variable cost approach would have prevented distortion. Petitioners further assert that the cross-section data weighing method accepted by the Board distorts dealer costs and further inflates the price of milk by systematically and dramatically discounting the low cost processor and magnifying the impact of the high-cost processor.[10]

---

8. The *Colteryahn* case interpreted the original version of Section 801 which provided: "The [Board] shall base all prices upon all conditions affecting the milk industry in each milk marketing area, including the amount necessary to yield a reasonable return to the producer and to the milk dealer." 31 P.S. § 801 (1937) (subsequently amended).

9. The determination of the appropriate standard is a ruling of law over which we exercise plenary review; whether the evidence reflected a repre-

sentative cross-section is a factual determination over which our review is limited to determining whether the finding is supported by substantial evidence.

10. Petitioners also contend that Mr. Herbein's testimony on the cost of school deliveries was not credible. The Board resolved the conflicting testimony on delivery costs. Official General Order, Sept. 22, 1995, Findings of Fact 13, 15. We will not disturb these credibility findings on appeal.

The Milk Marketing Law gives the Board broad discretion in setting milk prices and in the method for determining such prices. *Finucane v. Pennsylvania Milk Marketing Board,* 150 Pa.Cmwlth. 319, 615 A.2d 936, 937 (1992); *appeal denied* 534 Pa. 651, 627 A.2d 181 (1993). Petitioners acknowledge that there are many different ways to weigh the cross-section data. Thus, it is not surprising that petitioners' expert witness considered one method to be the optimal method and the staff and dealers recommended another. The same is true of the proffered total-cost distribution versus variable cost approach to the dealer cost data. In each case, the Board's findings are supported by the record. Factual findings, particularly those involving statistical data which are subject to reasonable differences in interpretation, raise technical questions within the Milk Marketing Board's expertise and will not be disturbed on appeal as long as such findings are supported by the record. *Lily-Penn Food Stores, Inc. v. Commonwealth, Milk Marketing Bd.,* 42 Pa.Cmwlth. 92, 400 A.2d 661, 664 (1979). Accordingly, we will not disturb the Board's order establishing milk prices for Area 1.

COLINS, President Judge, dissents.

### ORDER

AND NOW, this 18th day of October, 1996, the Official General Order No. A–890 of the Pennsylvania Milk Marketing Board is hereby affirmed.